(57 Misc. Rep. 331)

PEOPLE ex rel. EMPIRE CITY TROTTING CLUB v. STATE RACING COMMISSION et al.

(Supreme Court, Special Term, Westchester County. April 13, 1907.)

1. MANDAMUS—PUBLIC BOARDS—MATTERS OF DISCRETION—GRANT OF LICENSE.
    Laws 1895, p. 373, c. 570, gives the state racing commission certain. control over the operation of race courses. Section 6 provides that any corporation or association may annually apply to the state racing commission for a license to conduct race courses, and if, in the judgment of such commission, a proper case for the issuance of such license is shown, it may grant the license. *Held*, that the statute confers on the commission an absolute discretion in the matter of granting or refusing a license to an association, regardless of the fact that it possesses the requisite statutory qualifications to make it competent to receive one, and hence mandamus will not lie to compel the granting of a license by the commission.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Mandamus, §§ 134, 189.]

2. LICENSES—SUBJECTS—DISCRETION OF COMMISSION—AMENDMENT TO LAW.

The absolute discretion in the matter of granting or refusing a license to any association to conduct a race course, given to the state racing commission under Laws 1895, p. 373, c. 570, § 6, was not affected by the amendment to the act made by Laws 1902, p. 679, c. 257, § 1, providing that no certificate of incorporation wherein the right to conduct running races is claimed shall be filed without the approval of the state racing, commission indorsed thereon.

3. VENUE—OBJECTIONS—WAIVER.

A stipulation by the attorneys, made when a cause was originally brought before the court, to the effect that the hearing should be adjourned to a future day before a certain court, constituted a waiver of the defendant's right to object that the cause was not heard in another district.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Venue, § 30.]

Mandamus by the people, on the relation of the Empire City Trotting Club, against the state racing commission and others, to compel the defendants to issue to the relator a license. Writ denied.

James Russell Soley, Francis A. Winslow, and Frank S. Angell, for relator.

Franklin Bartlett and Welton C. Percy, for defendants.

Joseph S. Auerbach and Herbert Barry, for Jockey Club.

MILLS, J. This is an application made by the relator that a peremptory writ of mandamus issue to the defendants, as the state racing commission, commanding them forthwith to issue to the relator a license, under section 6, c. 570, p. 373, of the Laws of 1895, commonly known as the "Racing Law," permitting the relator to conduct a running race and steeplechase meeting during the year 1907 at its track at Yonkers and Jerome avenues, in the city of Yonkers, Westchester county, N. Y. It is established and undisputed that the relator was duly incorporated under that act in August, 1899, and that it possesses all the statutory qualifications necessary under that act to make it competent to receive such license, such as having made and filed the proper certificates: its capital stock being fully paid in, and it being possessed of and maintaining a race track of the description specified in the act.

On the 23d of January last the relator made application in writing to the state racing commission for such a license. This application set forth in detail its various qualifications. On the 23d of February last the commission, at a meeting held in the city of New York, denied said application and made its decision to that effect in writing, which specified as the grounds of its denial the following: (1) That the other six metropolitan racing associations and the Saratoga Racing Association, having regularly held their race meetings for many years and established valuable and important annual stakes, should have preference over the relator. (2) That the racing dates already assigned by the Jockey Club, with the approval of the defendant, to such associations, comprise all the available racing dates during the statutory period permitted; i. e., from April 15th to November 15th of the present year. (3) That those dates, so assigned, should not be curtailed. (4) That there should not be racing upon two of the dif-

ferent metropolitan tracks upon the same days. (5) That the Saratoga track should be regarded as practically competing with the metropolitan tracks, and that, therefore, racing should not be permitted upon a metropolitan track, including that of the relators, during the days assigned to the Saratoga Association. (6) That, for all these reasons, it would not be for the best interests of racing in this state to grant a license to the relator for the current year.

At or about the time that the relator made its application to the commission, as above stated, application was also made to it by each of the following named eight other racing associations, viz., Westchester Racing Association, Coney Island Jockey Club, Brooklyn Jockey Club, Brighton Beach Racing Association, Saratoga Association, Queens County Jockey Club, Metropolitan Jockey Club, and Buffalo Racing Association, all of which were granted by the commission, and a license by it issued to each of said eight associations to hold a meeting upon its track during certain specified days of the statutory racing period of the current year. Of those associations six, viz., the Westchester Racing Association, the Coney Island Jockey Club, the Brooklyn Jockey Club, the Brighton Beach Racing Association, the Queens County Jockey Club, and the Metropolitan Jockey Club, each maintains a race track within the metropolitan district of Greater New York, to which practically the relator also belongs.

The following are the various provisions of the act of 1895 which relate immediately to the question involved in this application, viz.:

(1) From section 3 of the act:

"Any corporation formed under the provisions of this act, if so claimed in its certificate of organization, and if it shall comply with all the provisions of this act, and any other corporation entitled to the benefits and privileges of this act as hereinafter provided, shall have the power and right to hold one or more trotting or running race meetings in each year and to hold, maintain and conduct trotting or running races at such meetings."

(2) From section 4:

"In the case of race courses to be used for running races or steeplechases, a license from the state racing commission must also be obtained in the manner hereinafter provided, and such license be filed with such certificate."

(3) From section 6:

"Any corporation or association desiring to obtain the benefits of the provisions of section three of this act, if proposing to conduct a race course or race meeting for running races or steeplechases, may annually apply to the state racing commission for a license to conduct running races and race meetings or steeplechases and steeplechase meetings, as the case may be. If, in the judgment of such commission a proper case for the issuance of such license is shown, it may grant such license, for a term of one year. * * *"

(4) From section 7:

"If any corporation or association to which a license shall be granted shall fail or refuse to comply with the provisions of this act, or with the terms and conditions of its license, or if for any other reason the continuance of such license shall not be deemed conducive to the interests of legitimate racing, the said commission, upon the complaint of the said Jockey Club, in the case of race courses to be used for running races, or upon the complaint of the said National Steeplechase Association, in the case of race courses to be used for steeplechases, shall have the power to cancel and revoke such license.

Written notice of such complaint shall be given to such corporation or association by said state racing commission within five days after receiving such complaint, which notice shall specify a time and place of hearing thereon. If the commission cancels and revokes such license all powers exercised under section three of this act by the corporation or association to which such license was granted shall cease and terminate."

The relator's certificate of organization contained the statement or claim specified in the above-quoted provision of section 3 of the act in these words, viz.:

"It is proposed to exercise the particular powers conferred by section 3 of the act above mentioned" (referring to chapter 570, p. 371, of the Laws of 1895).

The contention of the relator here, in support of its application, is that by the statute the discretion of the defendants in granting or refusing a license is limited to the determination of the question whether or not the applicant possesses the statutory qualifications to make it competent to receive a license; in other words, that, if it be clear that such applicant possesses those qualifications, viz.: (1) That it has made and filed the proper certificates; (2) that its capital stock has been subscribed for and fully paid in; and (3) that it actually maintains a race track not less than one mile in length or circumference—it is the duty of the commission to grant it a license. The relator further here contends that, it being clear that the relator possesses these statutory qualifications, the denial by the defendants of its application for a license was arbitrary, capricious, and wrongful, and that, therefore, the writ of mandamus should issue to compel defendants to grant its application. On the contrary, the defendants contend (1) that, inasmuch as the power to grant a license is, to some extent at least, discretionary with the commission, and the commission has exercised its discretion and refused relator's application, mandamus will not issue to compel the commission to grant it; and (2) that the statute vests in the commission an absolute and unqualified discretion in the matter of granting or refusing the license, and that, therefore, its action in that regard is not here reviewable.

It is an elementary rule of general application that mandamus will not issue to compel a public officer to exercise a discretionary power in any given way, but will issue merely to compel him to act when he has refused to exercise the power at all. The general rule, however, is to be restricted to action of the officer within the statutory limits of his discretion. When his discretion or power of judgment is by the statute limited to the determination of the existence of certain statutory qualifications on the part of the applicant as conditions precedent to the exercise of the power in a certain way, and it is demonstrated that those qualifications exist, a mandamus may issue to compel the exercise of the power in that way. It may be said that in such case demonstration of the existence of those conditions ends the discretion. Of the determination by a municipal civil service commission in classifying positions in the public service, the Court of Appeals, in the recent case of People ex rel. Schau v. McWilliams, 185 N. Y. 92, 77 N. E. 785, Chief Justice Cullen writing, held:

"Such determination, however, is not final, but is subject to a limited and qualified judicial control, to be exercised in a proper case by mandamus. The

general principle that mandamus will lie against an administrative officer only to compel him to perform a legal duty, and not to direct how he shall perform that duty when the manner of performance is in his discretion, is not a valid objection to the use of that remedy. It will also lie to compel such officer to correct an abuse of such discretion. If the determination clearly violates the Constitution or the statute, mandamus will lie to correct it; if not, the courts should not intervene, and to this extent only should they exercise their power of review." 185 N. Y. 93, 77 N. E. 785.

In the case of Ramsay v. Hayes, as Fire Commissioner, etc., 187 N. Y. 367, 80 N. E. 193, that court very recently held that mandamus was the proper remedy of a retired fireman to review and correct the determination of a fire commissioner fixing the amount of his pension, which by statute depended upon certain facts to be determined by the commissioner; e. g., length of service of the retiring fireman, extent of his disqualification, physical or mental, and the condition of the pension fund—i. e., whether or not sufficient to pay all entitled. The opinion of that court, Chief Justice Cullen writing, says:

"It is true that under the statute the commissioner had no arbitrary power to award the plaintiff such compensation as he saw fit, but was required to allow him half pay unless the relief fund was inadequate to sustain that burden. Nevertheless it was the commissioner that in the first instance was to make the determination, and if he erred in that determination the plaintiff's remedy was by a direct proceeding to compel the commissioner to make a right determination. We do not say that the determination of the commissioner was a judicial one, to be reviewed only by certiorari; on the contrary, it was administrative, the proper discharge of which could be enforced by mandamus." 187 N. Y. 371, 80 N. E. 194.

I conclude, therefore, that if the relator's contention, to the effect that the discretion of the state racing commission is limited to the determination whether or not the relator has the statutory qualifications necessary to make it competent to receive a license, is correct, then this application for the writ is well made and should be granted. The vital question in the matter, therefore, is: What is the character of the discretion, as to granting or refusing licenses, which is vested by the act in the commission? If such discretion be limited, as claimed by the relator, this application for the writ should be granted; but if it be absolute, as claimed by the defendants, this application should be denied.

From a review of the statutory provisions applicable to the matter, their peculiar phraseology, and the history of such legislation, I conclude that the legislative intent was by the act of 1895 to give to the state racing commission an absolute discretion in the matter of granting or refusing a license to an association possessing the statutory qualifications to make it competent to receive one. In construing a statute, it is always competent and often exceedingly helpful to consider its history and the mischief which the Legislature by its enactment sought to prevent. In the case of Grannan v. Westchester Racing Association et al., 153 N. Y. 449, 47 N. E. 896, the Court of Appeals upon this point, in reference to this very act, said:

"The obvious purpose of the act of 1895 was to permit honest and legitimate racing, and prevent the evils which had previously attended that class of amusements. Although it authorized horse racing, it was intended to guard and restrict it, so as to prohibit the abuses that had hitherto existed. To ac-

complish that end a state racing commission was created, and the Jockey Club was practically made the supervisor of all running races and running race meetings, with power to make such reasonable rules and regulations as it might from time to time deem proper for their control. Considering the corrupt practices which formerly prevailed, that the purpose of the statute and rules of the club was to prevent their continuance, and that the rules were in effect adopted by statute and made applicable to all racing associations organized under it, it is manifest that the rules which permitted the Jockey Club to exclude a person guilty of dishonest practices, or of willful breach of its rules, from races conducted by associations subject to them, cannot, as a matter of law, be held unreasonable." 153 N. Y. 461–462, 47 N. E. '900.

The chief means provided by the act to secure the desired end, viz., "to promote honest and legitimate racing and prevent the evils which had previously attended that class of amusements," were (1) the license by the commission, and (2) compliance with the rules and regulations established by the Jockey Club, which by section 6 of the act were expressly made subject to be modified or abrogated by the commission. Therefore absolute control by the commission is the main reliance of the act to promote and secure the best interests of the sport authorized by it.

If the construction claimed by the relator were adopted, the commission would be deprived of all effective control of the matter, except through the rules of the Jockey Club, which then, doubtless, could not be so made as to practically nullify a license. According to that contention, any five persons who would contribute the necessary funds to establish a race track of the given statutory dimensions could as a matter of right yearly hold one or more running race meetings. So construed, the act, prior to the amendment of 1902 requiring the consent of the commission to a certificate of incorporation, would have been anything but restrictive. In the Grannan Case, supra, the Court of Appeals further said:

"It is to be observed that the only legal right the Westchester Racing Association possessed to conduct races for any stake or reward was under and by virtue of a license issued by the racing commission pursuant to the statute of 1895." 153 N. Y. 459, 47 N. E. 899.

And again:

"Thus the right to establish and conduct races in this state was a limited one, dependent upon the consent of the racing commission. * * *" 153 N. Y. 460, 47 N. E. 899.

While the question considered and decided by the court in the Grannan Case was not such as to bring before the court for decision directly the question whether or not the power of the commission to grant or refuse a license to an association having the statutory qualifications is one resting absolutely in the discretion of the commission, yet the reasoning of the opinion indicates the view, at least of the writer, if not of the entire court, that such discretion is absolute, and not limited merely to a determination of the existence of such qualifications. The language used in section 6, c. 570, p. 373, Laws 1895, conferring the power to grant a license, is apt to make its exercise purely discretionary with the commission. The language used is not: "If a proper case for the issuance of such a license is shown, it may grant such license." But it is: "If, in the judgment of such com-

mission, a proper case for the issuance of such license is shown, it may grant such license."

This view of the absolute discretion of the commission receives confirmation from the provisions of section 7 of the act as to the revocation of a license. There express power is given to the commission to revoke a license "if for any other reason the continuance of such license shall not be deemed conducive to the interests of legitimate racing." The term "legitimate" here is evidently used in its broad, not technical, sense, and means "good" or "proper," and not merely unlawful. The deeming—i. e., the conclusion—is made to be that of the commission in the exercise of its untrammeled discretion. Counsel upon both sides seem to be agreed in this construction of the provisions conferring the power of revocation. It would be a strange thing, indeed, if the commission were compelled to grant a license to an association simply because such association was formally duly organized and had provided a race track of the statutory dimensions, and then at once thereafter, upon complaint of the Jockey Club, the commission could revoke the license simply because it thought that the continuance of the license would not be conducive "to the interests of legitimate racing." I think that the expression, "in the judgment of such commission," in section 6 of the act, in the provision as to granting a license, implies a discretion as absolute to grant or refuse an application for a license as do the provisions in section 7 express an absolute discretion to revoke.

The counsel for the relator relies strongly upon the amendment made in 1902 (Laws 1902, p. 679, c. 257) to section 1 of the act, upon the express recommendation of the state racing commission. By that amendment it was provided:

"No certificate of incorporation under this section. wherein the right to conduct running or steeplechase race meetings is claimed, shall hereafter be filed without the approval of the state racing commission endorsed thereon or annexed thereto, stating that, in its opinion, the purposes of this act and the public interests will be promoted by such incorporation, and that such incorporation will be conducive to the interests of legitimate racing."

The counsel for the relator maintains that, if the construction here claimed by the commission were correct, such amendment was entirely unnecessary, as the same purpose could readily be accomplished before the amendment simply by the commission refusing a license. There is force in this reasoning; but it does not appear to me to be sufficient to overcome the strong reasons for the construction of the original act, before the amendment, so as to make the discretion of the commission absolute in the matter of granting or refusing a license. It may well be that both the commission and the Legislature had become impressed that there was some incongruity in the original act in permitting such an association to be established, at least nominally, for the purpose of conducting such meetings, and to create and maintain its track therefor, and in still leaving its power to conduct running or steeplechase race meetings upon such track dependent upon the absolute discretion of the commission, to be exercised anew each year. This amendment evidently sought to remove from the act such possible or apparent incongruity.

I do not attempt to consider the reasons for their action in denying the relator's application for a license given by the defendants in their certificate of such denial and in their opposing affidavits, because, in the view which I take of their power, it is immaterial whether those reasons appear to me to be good or not. Still I can appreciate how the defendant members of this commission, with their special knowledge and experience in racing matters, may well think that it would not be "conducive to the interests of legitimate racing," either to permit two race meetings at the same time in or near Greater New York, or one meeting in that locality while the Saratoga meeting is pending, or to shorten the time allowed to either of the now licensed associations, or to deny a license to either of those associations which have recently yearly successfully conducted such meetings, so that the relator may have opportunity this year to try the experiment of conducting such a meeting upon its track. While not undertaking to pass upon the sufficiency of these reasons, not deeming that matter subject to review here, I still appreciate that such reasons might well seem to the commissioners to be weighty and convincing, and I do not think that I could declare their action, based upon them, in denying relator's application, to have been arbitrary and capricious.

It seems to me that the stipulation entered into between the attorneys on the 16th of March, when this matter was originally brought before the court upon the return to the order to show cause, to the effect that the hearing should be adjourned to the 30th day of March, at the place specified, before me, "and that the same shall be heard and determined at said place," was a waiver of the right of the defendants, if they had such right, to object that this application for the writ should not be made in the Ninth judicial district. Therefore I have not otherwise examined such objection upon its merits.

The application or motion for a peremptory writ of mandamus is denied.