CASE 17.—ACTION BY LATONIA AGRICULTURAL ASSOCIA-
TION AGAINST THE STATE RACING COMMIS-
SION.—December ʼ10, 1909.

# State Racing Commission v. Latonia Agricultural Ass'n.

Appeal from Kenton Circuit Court (Common Law and Equity Division).

M. L. HARBESON, Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1. Constitutional Law—Police Power—Means Adopted in Exercising—Discretion of Legislature.—The means adopted by the Legislature in the exercising of the police power, so long as they have an ascertainable relevancy to the object, are within the scope of that power, and whether the end justifies the means is exclusively for the legislative discretion, and whether the means bear a pertinent and reasonable relation to the end may be looked into by the courts, so far only as to determine the fact of pertinency and reasonableness, and the courts will not declare an act unconstitutional except when the means adopted are manifestly unreasonable or bear no logical relation to the object of the legislation.

2. Constitutional Law—Nature of Government.—The object of government is to conserve the public welfare which is done by promoting legitimate occupations and industries, as well as by checking evils that have an immoral tendency.

3. Animals—Breeding—Statutory Regulations.—Act March 23, 1906 (Laws 1906, p. 466, c. 137), to regulate the racing of running horses and to establish a state racing commission, and prescribing its powers and duties, was intended to foster the industry of breeding thoroughbred horses.

4. Animals—Breeding—Regulation—Police Power—Fostering Industry of State.—The fostering of the industry of breeding thoroughbred horses in the state is within the police power.

5. Theaters and Shows—Regulation—Police Power—Horse Racing.—Horse racing in public may be regulated by a state under police power, or may be prohibited altogether.

6. Constitutional Law—Legislature—Delegation of Power.—Act March 23, 1906 (Laws 1906, p. 466, c. 137), entitled an act to regulate the racing of running horses, to establish a state racing commission, and prescribing its powers and duties, provides (section 1), that corporations formed for the purpose of racing and breeding or improving the breed of horses and conducting races may, subject to the provisions of the act, hold one or more running race meetings each year. Section 2 provides for a state racing commission of five persons with stated qualifications. Sec. 3 gives the commission power to prescribe regulations under which running races shall be conducted, and forbids the holding of races except by a corporation or association licensed by the commission. The act. also provides that the decision of the commission in issuing, refusing, or revoking licenses shall be subject to a court review. Held, that the act is a police regulation, not a total prohibition, outlawing all racing, except as licensed by the commission, who shall in advance, prescribe the general conditions upon which the license may be obtained, and shall ascertain the fact whether a given applicant for license is so situated as to conduct orderly, lawful public races; the Legislature declaring the law, and the commission ascertaining the facts, so that the statute does not give the commission arbitrary power or devolve upon it the power of legislation so as to render it unconstitutional.

7. Constitutional Law—Legislation—Delegation of Power.—The provision giving courts jurisdiction to review the action of the racing commission would not relieve the. act from the objection, if there were any, that it conferred arbitrary power on the commission, as the courts cannot exercise any but judicial functions, and cannot review on appeal purely ministerial discretion and such power cannot be conferred upon them by legislation, nor can the commission as ministerial officers exercise judicial powers.

8. —Constitutional Law—Uniformity—Class Legislation.—Class legislation is repugnant only when it is special, and not general and partakes of the character of a private act, and Act March 23, 1906 (Laws 1906, p. 466, c. 137), to regulate the racing of running horses, which requires the procuring of a license to conduct such races, and exempts trotting races from the operation of such act, is not unconstitutional because class legislation, since running and trotting races are distinct classes.

McQUOWN & BECKHAM and J. MORGAN CHINN for appellant.

HARVEY MYERS for appellee.

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

This appeal involves the construction and constitutionality of the act of March 23, 1906 (Laws 1906, p. 466, c. 137), entitled "An act to regulate the racing of running horses in the commonwealth of Kentucky, and to establish a state racing commission and prescribing its powers and duties." By section 1 of the act it is provided that corporations "formed for the purpose of racing and breeding, or improving the breed of horses and conducting races and contests of speed, shall have the power and right, subject to the provisions of this act, to hold one or more running race meetings, in each year, and to hold, maintain and conduct running races at such meetings." By the second section it is provided that the state racing commission shall consist of five persons, three of whom shall be breeders of thoroughbred stock, and no two of whom shall be members of the same racing association; and by the third section it is provided that: "Said commission shall have the power to prescribe rules, regulations and conditions under which running races shall be conducted in this state, and no races shall be conducted except by a corporation or association duly licensed by said commission."

It is provided that associations which desire to conduct racing shall annually apply to "the state racing commission for a license so to do. If in the judgment of the commission a proper case for the issuance of such license is shown, it may grant the same for a term of one year; and every such license shall contain a condition that all races or race meetings, conducted thereunder, shall be subject to the rules, regulations and conditions, from time to time pre-

scribed by the commission, and shall be revocable by the commission for every violation thereof, or whenever the continuance of such license shall be deemed, by the commission, not conducive to the interest of legitimate racing.'' It was also provided that the decision and action of the commission in these matters shall be subject to the review of a court of competent jurisdiction. By section 4 of the act it is provided that running race meetings, at which racing is permitted for stakes, except as allowed by this act, are public nuisances, punishable by a fine of not less than $500 nor more than $1,000 for each day such racing is conducted. Section 5 exempts from the operation of the act trotting races, and races conducted by state, county, or other fair associations, holding only one meeting annually for not exceeding six days. The state racing commission adopted a rule prohibiting gambling on the tracks by bookmaking, and in the order announced that it deemed such form of gambling not conducive to the interest of legitimate racing. ''The Paris-Mutual'' and auction pool systems of betting at the tracks were recommended.

Thereafter the appellee applied for and obtained a license for conducting races on its track at Latonia, containing all the conditions required by the act as aforesaid, and with notice of the regulation made by the commission against bookmaking, and further notice of the order of the commission that it would deem a violation thereof sufficient ground for revoking the license of any association so offending. Thereafter, at its meeting in October, the appellee allowed to be installed and operated on its track the system of gambling known as bookmaking, and, upon receiving official notice thereof, the commission re-

voked appellee's license. Thereupon appellee insti-
tuted this action in the Kenton circuit court, and
sought an injunction against appellants to prevent
them from interfering with the operation of racing
on its track, on the ground that the act creating the
commission was unconstitutional, and that the regu-
lation concerning bookmaking was ultra vires.

The court below held the act unconstitutional in
two respects, holding:

(1) The Legislature had no authority to delegate
to the commission the power to make the regulation
complained of.

(2) The act is class legislation, and therefore void,
because trotting races are exempt from its operation.

The intention of the Legislature in the enactment
of the bill was in our opinion to foster a great indus-
try in this state, one which has gained for the state
much celebrity, and which has been a source of con-
siderable profit to the breeders of thoroughbred
horses. The object of government is to conserve the
public welfare. This is done by promoting legitimate
occupations and industries, as well as by checking
evils that have an immoral tendency. From the earl-
iest history of the commonwealth to the present it
has been deemed a proper exercise of governmental
power to foster and protect business enterprises
within the state and particularly the interests of agri-
culture and stock raising. It will be noted that to-
bacco culture, and the sale of tobacco, the protection
of the health and the promotion of the pure breeds
of live stock, even the protection of Kentucky's pro-
duct of pure whisky, have all been the subject of leg-
islative protection. As to live stock interests, begin-
ning with the scalp laws, when Kentucky was a wil-

derness infested with wild beasts, down to the crea-
tion of the State Fair Association by a recent Legis-
ture, and including quarantine regulations, the dog
tax law (held to have been a protective measure for
sheep husbandmen), and the act now in question, the
concern of the Legislature has been to protect and
promote breeding industries in live stock within this
state. Given that the subject is one for the legiti-
mate exercise of the state's police power, then the
means adopted by the Legislature, so long as it has
an ascertainable relevancy to the object, is clearly
within the scope of that power. Whether the end jus-
tifies the means is exclusively for the legislative dis-
cretion. Whether the means bear a pertinent and
reasonable relation to the end may be looked into by
the courts so far only as to determine the fact of
pertinency and reasonableness. Only when the means
adopted are manifestly unreasonable and oppressive,
or bear no logical relation to the object of the legis-
lation, are the courts at liberty to declare the act un-
constitutional.

The act now in question does not in terms declare
its purpose. To ascertain it, recourse may be had,
indeed must be, to concurrent and past history of
the people and conditions, that the court may sit in
the light of the enactors of the statute in determining
what was in the legislative mind. The horse has al-
ways been, particularly among Caucasian peoples,
"the friend, companion, and servant of man." In
war he was well-nigh an indispensable factor. In
peace, even more so. For many centuries he afforded
the principal means of travel. By reason of his
strength and docility, he enabled the husbandman to
profitably till the soil, and move his crops to market.
He was the carrier of freight as well as passengers.

He bore his master on his journeys of business and state, and his mistress on her missions of worship and social duty. Whether as a charger bearing the knight, or the palfrey, my lady, or old Dobbin at the plough, he was more or less constantly associated with man as his dependable servant, intelligent companion, and "friend in need." It is no wonder he had the care and attention prompted by gratitude, pride, and self-interests. He needs be a good horse to well serve a busy master. Selection naturally followed from observation of desirable qualities; the best being kept to perpetuate their kind. He excelled his contemporaries, the ox and the ass, not so much in strength, as in speed, beauty, and endurance. His capabilities were more extensive. Living without recreation would be a hard, if not unnatural, lot. Even the Puritans found it so.

The innocent amusements of a people are proper subjects of encouragement. If the old adage be true that "all work and no play makes Jack a dull boy," it is equally true that all play and no work makes Jack a poor man. The happy medium is the safest lot. Among the recreations of the English speaking people for many centuries has been that of horse racing. It takes a good horse to run a good race. These tests of strength, fleetness, endurance, and intelligence have been the means by which the quality of the horse has been established. The constant association in business, labor, and pleasure with this noble animal has been so long with our people that it has grown to be a part of their nature. Whatever our origin, whether English, who loves the thoroughbred, Irish, who developed the Hobbie, or Scot, who gave the world the useful Galloway, or the people just south of the channel who made a specialty of the

heavy draft breeds, we have no complete history without mention of the kinds, uses, and quality of the horse. That he has contributed so much to pleasure, including harmless amusement, detracts nothing from his service to mankind. Notwithstanding that we now live in an age of machinery and of mechanical motors, the horse has lost none of his ancient hold upon the admiration of men, and is found to be as much in demand, if not as indispensable, as ever he was. Nothing that has been and is yet the subject of such general interest and utility can be regarded as beyond the legitimate concern of the legislator.

Thoroughbred horses, so called, have been bred and used mainly for the development of speed upon race courses. So far they would appear to be only a means of amusement. But they are more. They are known to be a foundation, or that their blood and qualities enter largely in every other excellent breed of horse in this country except the heavy draft animals. The sons and daughters of Messenger, son of Mambrino, are the great trotters and pacers, while Denmark, Blood's Black Hawk, the Clays, Peters' Halcorn, Copperbottom, and other notable strains of thoroughbreds, infused through domestic blood lines, have produced that strictly American horse, the saddler, who carries his rider with ease and without discomfort to horse or horseman. And so Mambrino was the progenitor of a tribe of coach horses of great excellence and value. Indeed, it would seem not to require a knowledge of the history of the breeds of horses to appreciate the fact that, where grace, beauty, strength, amiability, and sagacity are to be found in a breed of horses, those qualities imparted to any other breed of horses lack-

ing in any of them will necessarily improve the latter stock.

Hence it is a legitimate field for governmental action to foster and promote a breed of horses whose powers and qualities are of such great value and interest to so many people. But the thoroughbred is pre-eminently a race horse. Races are run mainly for amusement. While purses, cups, and other trophies are awarded the winners, and are no doubt valuable inducements to the owners, so far as the public are concerned it is the exhibition of skill, speed, and intelligent courage that attracts the patrons of the race course. Attendant upon this sport there has always been more or less of wagering upon the result of the races. Without pausing to analyze the matter, it is enough to note it as a well-known fact. Sometimes the practice grows to such proportions as to constitute a public nuisance. The races attract large numbers of people at the courses. Many indulge in bets on the results of the races. Moral laxity ensues. There is great temptation to fraud by the betters of heavy stakes, as by bribing jockeys, doctoring horses, and other pernicious practices. Scandals result. Such conditions are inimical to the public welfare. They have arisen in the past, and again recently. ·

Whether to stop racing altogether, or to regulate it so as to exclude the objectionable features, was the problem before the Legislature. As against the first alternative there were the many and important breeding interests in the state to be considered, and the policy of noninterference with amusements of the people not necessarily harmful to the public. On the other hand, the question arose: How deal effectively with the objectionable features? For many years in this state there has existed stringent legislation

against gambling (section 1977, Ky. St. [Russell's St. sec. 3575]), which has been held to include betting on horse races. Cheek v. Commonwealth, 100 Ky. 1, 37 S. W. 152, 18 Ky. Law Rep., 515. Other sections (1960-1967, Ky .St. [Russell's St. secs. 3558-3564]) penalized betting or gaming by machines or other contrivances, which was held in Commonwealth v Simonds, 79 Ky. 618, to include betting by the machine or device known as "Paris-Mutual." But the Legislature by section 1961 excepted race tracks from the operation of the "Paris-Mutual" system of betting, which was sustained by this court as a legitimate exercise of police power, in Grinstead v. Kirby, 110 S. W. 247, 33 Ky. Law Rep. 287. Still the prohibited gaming was not broken up. Betting by bookmaking was freely indulged upon many of, if not all, the race courses in this state. Similar conditions existed, or had recently in many of the other states of the Union.

As population and wealth increases so does idleness. If horse racing, the oldest and most attractive of sports to the English speaking people, is freely indulged, and without hindrance or regulation, the large crowds attracted, including youth, as well as idle and vicious persons bent on getting a living for nothing, the temptation and opportunities for indulging in a practice demoralizing to the public, and which has proven its banefulness wherever indulged, would grow and be unlimited in its possibilities for mischief. The Legislation of Kentucky had proven ineffectual. What had been the experience of other sections of the country? In 1664, under Governor Nichols, the first English governor of New York, running races were established on Long Island, and were continued for about 80 years, until the gamblers

made it so indecent that it had to be abandoned. It was later re-established and continued until the Continental Congress adopted a resolution advising the people to abstain from horse racing. This was aimed, it has been advanced, against the one great evil, the prodigality of the people in gambling connected with horse racing, a condition intolerable in the midst of the grave struggle the Colonies were then engaged in with the mother country.

In Connecticut in 1778 horse racing was prohibited by that colony under the penalty of the forfeiture of the horse and a fine of 40 shillings. In 1749 Rhode Island enacted a statute of similar purport. In 1748 running races had become so common in New Jersey that they were declared by legislation as a public nuisance, and were restricted to certain days in the year. This included expressly pacing and trotting as well as running races. Thus it is seen that in the early history of the Colonies conditions existed not unlike those more recently encountered. Public opinion revolted when the gamblers overran the race tracks. Legislation leveled at their evil had taken two forms—one to prohibit racing entirely, the other to restrict it to short racing seasons in each year. So, recently, public opinion has demanded a cessation of the betting evil upon the race courses. Whether is was a "moral spasm," as some term it, it had the precedent of being a spasm which the government had the power to respect. It resulted that many states outlawed racing altogether. Others, notably New York, undertook to regulate it by law.

While the people of Kentucky cannot be regarded as behind those of any of the states in their standards of morality, they considered, and ought to have considered, the main evil in the light of the effect of

contemplated legislation upon legitimate business interests and a harmless amusement. Kentucky's Legislature chose to follow the course of New York in dealing with the subject. Indeed, the act under discussion is almost a literal copy of the New York statute. Vol 1, p. 370, c. 570, Gen. Laws N. Y. 1895. The question arose under the New York statute in the case of People ex rel. Empire City Trotting Club v. State Racing Commission, 57 Misc. Rep. 331, 108 N. Y. Supp. 955, whether the legislation was constitutional. The powers conferred upon the state racing commission of that state were held to be not unconstitutional. The same view was expressed in Grannan v. Westchester Racing Ass'n, 163 N. Y. 449, 47 N. E. 896. The contention was made there as it is here that the act invested the state racing commission with legislative power, as well as with arbitrary power over the business and property of the citizen. If the act had the effect to do either, it would be in violation of the Constitution. The Legislature cannot delegate to another body the power to make laws unless the Constitution expressly so allows. And it does not in an instance such as this. An arbitrary power over the property of a citizen does not exist in this government. Nor may it be delegated by the Legislature to any body or set of men.

Horse racing may be regulated by the state under the police power of government. It might be prohibited altogether. Any amusement which calls together vast throngs of people, which excites in them passion or conduces to excesses, which is nearly always attended with gambling and attracts among its patrons common gamblers, and idle and vicious members of society, may be prohibited. Of course, then, it

may be regulated. Both courses have been pursued with respect to the particular amusement engaged in as a business by appellee. The precedents are both ancient and modern. The Legislature might have itself fixed the times of the races and the places, and have prescribed the particular conditions under which they might be held. What it did was to prescribe as a condition precedent to a race, that it be held only under a license from the state. All others were declared to be public nuisances. If the act had gone no further, appellee or any other person or association desiring to conduct a horse race would have been entitled to do so upon application for and receipt of a license permitting it. The language of the act conferring power upon the commission to grant, refuse, or revoke a license is as follows: "Said commission shall have the power to prescribe the rules, regulations, and conditions under which running races shall be conducted in this state, and no such races shall be conducted except by a corporation or association duly licensed by said commission, as herein provided.

"Any corporation or association desiring to conduct such racing may annually apply to the state racing commission for a license so to do. If, in the judgment of the commission, a proper case for the issuance of such license is shown, it may grant the same for a term of one year; and every such license shall contain a condition that all races or race meetings conducted thereunder shall be subject to the rules, regulations and conditions from time to time prescribed by the commission, and shall be revocable by the commission for any violation thereof, or whenever the continuance of such license shall be deemed by the commission not conducive to the interests of

legitimate racing. But if said license is refused or revoked, said commission shall publicly state its reasons for so doing, and said reasons shall be written in full in the minute book of said commission, which shall at all times be subject to inspection upon application of any one desiring so to do, and said finding of said commission shall be subject to the review of a court of competent jurisdiction: Provided, that a refusal of the commission to grant to any racing association a license, or to assign any racing association at least forty days in each year, if desired, for racing at such association, and the decision of such commission revoking any license of any association shall be subject to review of the courts of the state.''

If the state intended to license every applicant, there would be no use to confer the discretion upon any tribunal or body to ascertain whether each applicant was a suitable person to operate under the license. And, if the state had intended to license every applicant, or must, under the Constitution, treat every applicant alike, in that he must be granted a license if he applies, then the act falls to the ground, and all similar acts must fall. If the act were a revenue statute, all must have been granted a license who applied and paid the fees. But a police regulation necessarily involves selection, involves the power to permit some and to refuse others, to suffer the act at one time and place, or under certain conditions, and to deny it under all others. A police regulation pre-supposes a condition which, unless restricted, guarded, or controlled, will operate to the public disadvantage. In most instances the Legislature delegates, as it may, to some magistrate the ascertainment of certain facts upon which the law declared by the Legislature is to be operative. A police regulation

that is not a total prohibition necessarily implies a
discretionary selection of the persons by whom, and
the times and places when and where, and the condi-
tions upon which, the thing to be regulated, may be
done.

The statute under consideration is purely a police
regulation of the latter sort, and in no sense is it a
revenue statute.   Here the Legislature declares that
promiscuous public racing is detrimental to the public
good.   Hence it is prohibited.   But it also allows that
some racing, limited as to places and conditions, is
not hurtful.   It vests in the state racing commission,
a body of public officials, the power to select the
places and times, and to prescribe the conditions un-
der which the state's license will be issued.   These
officials are not permitted to act arbitrarily, or to
prescribe dissimilar conditions for similar situations.
When they prescribe their rules and regulations, they
are made public records, are open to all concerned,
must precede any act refusing or granting licenses,
may be altered or amended from time to time, so long
as they have bearing on the future only and are of
general effect.   ''Rules and regulations,'' as the term
is employed in the statute, implies uniformity, publi-
city, and the establishment of standards by which ap-
plicants or licensees may know in advance upon what
conditions the license may be granted, or will be with-
held or revoked.   The outline suggested is not be-
cause of the discretion vested in the board, but be-
cause the statute requires that there be rules and reg-
ulations.   A rule must necessarily be of general ap-
plication.   A regulation must apply impartially.

It is difficult to set down in terms of exact defina-
tion the dividing line between legislation and discre-
tionary regulation.   That the two are not the same

thing is known by everybody. The practice, the immemorial custom, is to commit to some administrative official or body the detail of execution in matters of police regulation, where the thing is not prohibited altogether. Some statutes confer more, some less, discretion upon the administrative official. Some limit the discretion to the ascertainment of a fact upon which the legislation is to become effective. Some in addition confer the duty and power to determine the propriety, or necessity, of permitting the thing. In all cases the Legislature selects the subject, and indicates the public policy with respect thereto. The subject is thereby brought within governmental control. Its free indulgence is deemed harmful. To so determine is the exclusive prerogative of legislation. The selection of the persons, places, and times, and the regulation of the conditions upon which it is to be exercised, are matters of executive detail, which may be, and which are always, delegated to the ministerial body. It is difficult to imagine, and more difficult to find, an instance of such police regulation, where some sort of discretion, more or less broad, is not vested in the administrative official by the Legislature.

The question at hand is not as if the Legislature had declared that all racing was legal, except such as the state racing commission should declare illegal. Nor is it the equivalent. It is the reverse. The Legislature has outlawed all racing, save such as is licensed by a board of officers, who shall in advance prescribe the general conditions upon which the license may be obtained. From the whole act, the evil which it sought to correct and the good it aimed to promote, it will be read that the Legislature invests the racing commission with the power to ascertain

the fact whether a given applicant for license is so situated as to conduct orderly lawful public races, to ascertain and set forth the particular states of fact that will promote the breeding of thoroughbred horses, and the conducting of legitimate races, and to prohibit the evil of unlawful gambling on the race courses; it being the purpose of the Legislature to encourage the first two, and to prohibit the other. The Legislature declares what is the law, the commission ascertains the facts—that is, the situation—upon which the law is applied. A similar statute was upheld in State v. Thompson, 130 Mo. 333, 60 S. W. 1077, 54 L. R. A. 950, 83 Am. St. Rep. 468. Also see Port Royal Mining Co. v. Hagood, 30 S. C. 519, 9 S. E. 686, 3 L. R. A. 841; People v. Gilman (Sup.) 103 N. Y. Supp. 954; People v. Grant, 126 N. Y. 473, 27 N. E. 964; Blue v. Beach, 155 Ind. 121, 56 N. E. 89, 50 L. R. A. 64, 80 Am. St. Rep. 195. Other statutes delegating to ministerial officers the power of regulation have been upheld, and those powers distinguished from a delegation of legislative functions in the following cases: Atlanta Express v. Wilmington & W. R. R. Co., 18 L. R. A. 393 (N. Car.) and Georgia R. R. & Banking Co. v. Smith, 70 Ga. 694.

A familiar subject of police control is the sale of intoxicating liquors. Without a license to do so, such sales in this state are illegal. By a charter of a town its trustees were given the power "to license all taverns within the limits of said town, granting to, withholding from the same as may be deemed expedient by said trustees," etc. While upholding the contention of the appellant that equality of treatment must be pursued by the trustees, this court in Mason v. Trustees, 4 Bush, 406, said that the trustees could not prescribe one license for one and a different

license for another. But the court added: "Nor would this equality be destroyed by the refusal to license any one they might deem unsuitable for such purpose, either because of immorality, want of qualification or because not suitably prepared for such business, nor a total refusal to any one after a sufficiency of such public houses had been licensed and set up." The only difference between that statute and this is that here general rules and regulations must be established by the licensing board. There it was in their fair discretion. Mason v. Trustees, supra, was followed in Adams v. Stephens, 88 Ky. 443, 11 S. W. 427, 10 Ky. Law Rep. 1031, and Pierce v. Commonwealth, 10 Bush, 6.

The powers conferred upon the state racing commission by this act are identical or analogous to similar powers conferred upon other ministerial officers by legislation. Counsel for appellant have cited and we quote from the following among others as being familiar, the legality of which, so far, has been unquestioned. Thus the board of prison commissioners is authorized to prescribe regulations and by-laws for the government and discipline of the penitentiaries and the officials thereof. Section 3812, Ky. St. (Russell's St. Sec. 5232). The state board of embalming has the power to prescribe "a standard of efficiency" for those engaged in that occupation, and to "abopt rules and regulations and by-laws, from time to time, * * * whereby the performance of all the duties of said board, and the practice of enbalming dead human bodies shall be regulated." Subsection 4, Sec. 1410, Ky. St. The state board of health has been invested with plenary power to make and enforce rules and regulations, and a violation of any of these rules is punished as a misdemeanor.

Section 2049, Ky. St. (Russell's St. Sec. 1759). The board of pharmacy has power to make by-laws for the proper execution of the law creating it. Section 2622 Ky. St. The board of control has the authority to "prescribe the rules and regulations" for the charitable institutions of the state. Subsection 13, Sec. 217a, Ky. St. The board of examiners created by the law regulating barbers "has power to adopt reasonable rules and regulations prescribing the sanitary requirements of a barber shop in cities of the first, second, and third class." Subsection 3, Section 165a, Ky. St. (Russell's St. Sec. 2281). The state board of Kentucky Children's Home Society is authorized to make all rules and regulations which it may deem necessary for the supervision and control of the children provided for by law. Subsection 2, Sec. 331c, (Russell's St. Sec. 3271). The trustees of the State University are empowered to make "proper regulations for the government of the college." Subsection 26, Sec. 4636c. The state board of education is required to prepare "rules, by-laws, and regulations for the government of the common schools of the state." Section 4382, Ky. St. (Russell's St. 5600). The board of park commissioners in cities of the first class is invested with full power to control the parks and public squares and adopt rules and regulations for the use of the same, and a violation of these rules is punishable as a misdemeanor. Section 2848, Ky. St. (Russell's St. Sec. 680).

The occurrence of similar provisions in the statutes of many states has given rise to litigation over the extent and nature of the power created in the minor boards. From the many adjudged cases this epitome of the law is stated in 22 American & English Encyclopedia of Law, p. 920: "The Legisla-

ture may authorize a particular board of officers, who have charge of the portion of the affairs of the state, or a city, such as a board of health, of police, or cattle commissioners, to make reasonable police rules and regulations.'' If that were not so, all government would have to be by the Legislature, requiring it to be in constant session. Nor then would the government be so efficient, elastic, and practical as is the existing system which deems that rules of boards and official discretion are not laws, but are facts upon which laws may depend to become operative in given instances.

A case on the other side of the line, if not indeed on both sides of it, is Noel v. People, 187 Ill. 587, 58 N. E. 616, 52 L. R. A. 287, 79 Am. St. Rep. 238. It is selected as showing the class to which appellee contends this case belongs. The state of Illinois had enacted a statute regulating the practice of pharmacy. The act prohibited any but licensed pharmacists from compounding or dispensing drugs, medicines, or poisons. The act further provided: ''The board of pharmacy may in their discretion issue permits to persons, firms or corporations engaged in business in villages or other localities, empowering them to sell the usual domestic remedies and proprietary medicines under such restrictions as the board of pharmacy may deem proper.'' The Supreme Court of Illinois held the act to be unconstitutional as to the sale of proprietary medicines, but constitutional as to prohibiting the compounding of medicines except by licensed pharmacists. In holding the act unconstitutional wherein it required a permit in the discretion of the board of pharmacists, as a prerequisite to the right to sell proprietary or patent medicines, the court rested its opinion on two grounds:

One, that there was a delegation of power by the leg-
islation to the board of legislative functions; the
other that the sale of proprietary medicines in origi-
nal packages, and not compounded by the seller, had
no just relation to the subject of the act; that it
could not in its nature matter whether a patent medi-
cine in its original package was sold by a licensed
pharmacist or by a merchant; that the skill of the
trained pharmacist would not in either event have
availed the public; and that the empowering of the
board of pharmacists to select arbitrarily those in a
community who should sell patent medicine was an
infringement of the citizen's natural right to sell his
property.

The last ground may be passed by without criti-
cism. But we are unable to perceive from the court's
reasoning or otherwise the distinction between the
discretion vested in the board of pharmacists to li-
censed druggists who compounded medicines and
those druggists who did not, yet who sold poisons
and patent medicines. The discretion of the board
was the same in each instance. If the exercise of
the discretion was a delegation of legislative power in
one instance, it appears to be equally so in the other.
Yet the court upheld the act as to the first instance
recited. The quality of the thing to be regulated,
whether it is the exercise of a needful calling, as for
example the operation of a slaughter house, or the
sale of meats or vegetables, or whether merely a
luxury or amusement, as the sale of intoxicating liq-
uors or the operation of a race course, enters into the
consideration in the decisions whether the thing reg-
ulated is a natural or property right, or whether it
is one that per se falls within the power and necessity

for regulation. Complaints may exist as to the former that could not arise as to the latter.

We conclude that the act under investigation does not give the commission arbitrary power or devolve upon them the power of legislation.

The commission promulgated a rule prohibiting betting by bookmaking upon race courses in Kentucky. Appellee was apprised of this rule before and when it was granted a license to conduct races. Subsequently it suffered the prohibitory form of gambling on its course. For that offense upon notice and a hearing, its license was revoked. We think it was not an improper exercise of power by the board or of discretion to have adopted that rule, nor was it arbitrary in enforcing it. It was unlawful in Kentucky for appellee to have suffered the acts complained of. It was not the commission's act that made it unlawful, but the legislative fiat. The effect of the commission's rule was that no one who habitually suffered such an unlawful procedure upon its course was fit to hold the state's license; that its course was directly subversive of the purpose of the statute, and ought to have been dealt with as it was.

The act does not apply to fairs and trotting races. This was held by the circuit court to constitute class legislation, as being repugnant to the Constitution. Class legislation is repugnant only when it is special and not general—when it partakes of the character of a private act. Classification of subject-matter is essential in legislation. Running races are as distinct as a class, as are running horses as a breed. Trotting races form a kindred, but not identical, class. The Legislature may have known that trotting races in Kentucky were not frequent enough, and not attrac-

tive enough or that the public concern as to them was not enough to necessitate their regulation. Whether they should be regulated is a matter purely of legislative discretion.

The poolrooms, places where betting on horse races was indulged, in Kentucky, became so arrogant and intolerable that the Legislature in an act approved March 18, 1908 (chapter 46, p. 119, Laws 1908), enacted drastic legislation against keepers, employes and promoters of poolrooms. By section 6 the act is not to apply to inclosures upon race tracks during regular race meetings, wherein horse racing is being conducted under license from the state racing commission. It is argued that that act legalizes bookmaking, and all other forms of betting on horse racing in Kentucky. The act intended to prohibit, not to encourage gambling. It struck at poolrooms. The statutes do allow "Paris-Mutual" wagers, and the exception in section 6 was to leave that feature of wagering in effect, and that only. Bookmaking as a form of gambling on horse races is or may be done elsewhere than in poolrooms. If it is, it is punishable by the statutes of this state But poolroom keepers and employes are punishable under the act of 1908 wherever they operate their rooms.

Some stress is laid in argument by appellant upon the provision giving the courts jurisdiction under the act creating the racing commission, to review their action, as relieving the act from the alleged vice of conferring arbitrary power on the commission. We attach no importance to that provision. The courts cannot exercise any but judicial functions. They cannot review on appeal purely ministerial discretion. Nor can such power be conferred upon them

by legislation.    Gorham v. Luckett, 6 B. Mon. 146. Neither can ministerial officers exercise judicial powers.    The courts may always, upon complaint of any one having an interest and feeling aggrieved, examine into the exercise of power by a ministerial officer to the extent of determining whether the particular power has been granted to the official, whether it is a legal power that could have been granted to him, or whether it has been exercised in a legal manner. This jurisdiction does not depend upon an act of the Legislature authorizing it, but inheres in the courts of general jurisdiction as an essential function of the judicial department of our government.

The judgment should have denied the injunction. Reversed and remanded, with directions to dismiss the petition.