Glenn **LOVERN, Commissioner of the Department of Public Safety, et al., Appellants,**

v.

**A. C. BROWN et al., Appellees.**

Court of Appeals of Kentucky.

March 12, 1965.

Rehearing Denied June 11, 1965.

Robert F. Matthews, Atty. Gen., Joe Nagle, Asst. Atty. Gen., William G. Mullins, Frankfort, Marvin C. Prince, County Atty., Benton, for appellants.

A. Joe Asher, Benton, for appellees.

HILL, Judge.

The appellant, Division of Boating, adopted a regulation pursuant to KRS 235.-320 to become effective February 15, 1963, which provided, among other things, that:

"2. No vessel shall operate, moor or be used within 100 feet of the Kentucky Dam generator water exhaust chutes."

The appellees, licensed commercial fishermen, filed this action in the Marshall Circuit Court, in which they charged the regulation in question was void and that they were entitled to injunctive relief against its enforcement. The appellees desire to conduct their commercial fishing enterprise within the restricted area because the fish are plentiful in this area and there is an abundance of feed in the form of cut up fish as they pass through the turbines. Appellees contend there is no hazard from boats operating within the restricted area.

The Marshall Circuit Court heard evidence in the case and entered judgment granting the relief sought. The Division of Boating, Glenn Lovern, Commissioner of Department of Public Safety, and other defendants, now appellants prosecute this appeal.

We shall refer in this opinion to the appellants as Commissioner, and to the appellees, A. C. Brown, et al., as appellees.

The Commissioner assigns the two following grounds for reversing the judgment of the trial judge:

1. The regulation is a valid exercise of police power.

2. This regulation does not involve unconstitutional delegation of authority.

KRS 235.280 provides as follows:

"The division, with the approval of the Commissioner of Public Safety, shall promulgate rules and regulations to govern:

"(a) The fair, reasonable, equitable and safe use of all waters of this state by the fishing public and the boating public of whatever nature or activity involved;

\* \* \* \* \* \*

"(c) The safe use and operation of all boats, floating docks, skiing ramps, slides or similar devices on any waters of this state."

KRS 235.320 empowers the division to make regulations as follows:

"The division, with the approval of the head of the department, may promulgate any rules and regulations not inconsistent herewith to carry out the purposes of this chapter."

We should define at the very outset the scope of the power of the trial judge and this Court to upset a regulation of an agency, such as the Division of Boating in this case.

■ We start with the premise that the regulation, with which we are concerned here, is one in the exercise of the police power of the State. To be valid it must be within the limits contemplated by the above quoted statutes, and it must be reasonable. In American Jurisprudence 2d,

Volume 2, section 296, under Administrative Law, it is said:

"It is stated as general propositions that rules or regulations of an administrative agency must be within the limitations of the law for the enforcement of which they are provided and must be reasonable; that the validity of a rule or regulation depends upon whether the administrative agency was empowered to adopt the particular rule and, if so, whether the rule, is reasonable; and that rules and regulations will be upheld where they are within the statutory authority of the agency and reasonable, or that they must be sustained unless unreasonable and plainly inconsistent with the statute. Only when discretion has been arbitrarily exercised, resulting in injustice or unfairness, do the courts intervene to strike down a rule promulgated by the proper agency designated to give appropriate effect to the provisions of the act involved."

■ We conclude the regulation is a valid exercise of the police power of the State and that it is well within the contemplations and limitations of the statutes above quoted.

Appellees argue that the regulation in question should be invalidated because it is unreasonable, arbitrary and uncertain of determination, and because it violates Section 60 of the Constitution of Kentucky, which prohibits any law or regulation to take effect upon the approval of any authority other than the General Assembly.

It may well be said that the enormous growth of government the past few decades has witnessed a gradual liberalization of our construction of Sections 27, 28 and 29 of the Constitution of Kentucky. In State Racing Commission v. Latonia Agricultural Association, 136 Ky. 173, 123 S.W. 681, 25 L.R.A.,N.S., 905 (1909), the Court said:

"In all cases the Legislature selects the subject, and indicates the public

policy with respect thereto. The subject is thereby brought within governmental control. Its free indulgence is deemed harmful. To so determine is the exclusive prerogative of legislation. The selection of the persons, places, and times, and the regulation of the conditions upon which it is to be exercised, are matters of executive detail, which may be, and which are always, delegated to the ministerial body * * *" See also Craig v. O'Rear, 199 Ky. 553, 251 S.W. 828 (1923); Sturgill v. Beard, Ky., 303 S.W.2d 908 (1957), and Sims v. Reeves, Ky., 261 S.W.2d 812 (1953), and Guthrie v. Curlin, Ky., 263 S.W.2d 240 (1953).

More recently the Court said in Commonwealth v. Associated Industries of Kentucky, Ky., 370 S.W.2d 584 (1963):

"Experience has demonstrated some of the power must be invested in other bodies so that the government may function in a world that progressively is becoming more complex. There is nothing wrong with this so long as the delegating authority retains the right to revoke the power. * * *

· "We have decided we will meet this problem with full recognition that legislative power often has been delegated, with full court approval, and it is not necessary to disguise such action in form of expression or words which have no verity."

Appellees may be assured we have considered Section 60 of the Constitution, as well as the eight cases cited by appellees.

It is our conclusion the regulation in question is not invalid because its effectiveness depends upon approval by an authority other than the General Assembly, as appellees contend.

Turning now to the evidence before the trial judge, keeping our eye on the squirrel to determine whether the regulation is reasonable, we find six witnesses testifying for the appellees. They were all licensed commercial fishermen. The substance of their testimony is that the area sought to be restricted is not dangerous; that no one has ever drowned there; that there is no marker defining the lower boundary of the area; that it is difficult for one traveling in a boat to determine the boundary; that if the regulation is upheld they will suffer considerable loss in income, sometimes as much as a hundred dollars a week. Yet, A. C. Brown, one of these six witnesses, was asked and answered as follows:

"Q. And were you aware of the fact that within the last two or three weeks or recently he (Clarence Lynn, a commercial fisherman) had considerable trouble in the very area you are talking about and almost lost his vessel there, or his boat?

"A. I heard about it.

"Q. You know it did happen, don't you?

"A. Yes."

Ben Hawkins, also a licensed commercial fisherman, said, with reference to the restricted area:

"Well, a nonexperienced boatman is like a nonexperienced driver, I guess. He doesn't have any business in the water in the first place."

Two witnesses were introduced by the Commissioner. The first, Cletis E. Antnip, Lieutenant of Public Safety Service with twenty-four years experience, testified:

"I would say, to me the water immediately below, approximately a hundred feet below the discharge of that powerhouse is dangerous waters for small fishing boats * * * I wouldn't fish immediately below that powerhouse. I wouldn't consider it safe. It is too dangerous for me. * *

Now, you have coming through the discharge of those turbines—each generator and each turbine will normally discharge from eight to ten thousand cubic feet of water per second. Now, then, this water is normally falling * * * about 57 feet. * * * Now, when it comes out of the discharge mouth of this turbine you have a tremendous boil there. The boil will normally be in the center and it will be 12 inches to 18 inches higher than at other places because the water is boiling up and coming through there. * * * But let me put it this way. It is possible that they might not know of this condition. Those generators are carrying large loads of electricity. They may be feeding Calvert City plants or they may be feeding Benton here or Mayfield. Now, if something occurs in that area to interrupt the flow of that power into that area, then these generators will tremendously speed up their action. There will be a more turbulent discharge below the powerhouse because of this. Sometimes they may go completely off and when they do that water will sink there two or three feet below the normal surface. It will make a pocket. It will create a pocket down in there and then the generators can come back on suddenly and then you have this water tremendously building up there again. Those are the sudden changes that can take place on those generators and turbines that will affect this water and make it much more dangerous at times than it will at others. * * * There is also another situation. * * * at times they take one of these generators off the line, that is, they don't have it producing electricity but it is standing there idle as a motor and in order to do that they use compressed air down over these turbine blades and force these tremendous volumes of water down off those blades with compressed air and you don't have any water coming through there and if the boys will remember that is whenever the water is smooth there. * * * Now, that water on the discharge below that powerhouse will be sort of smooth, you see. * * * and then later on, maybe just a few minutes the demand for electricity increases suddenly and that generator automatically goes on the line and the water starts flowing through there and it drives all that compressed air and water out of there and it comes up there in huge bubbles and all of that water will just pile up there for a matter of a few seconds which will capsize a boat which is there."

The other witness introduced by the Commissioner was B. N. Dossett, a water patrolman for the Department of Public Safety. He had been on the river all his adult life. When asked whether there was danger in the area in question, he said:

"Yes. And it is this dangerous, when I catch or see a man violating this rule and regulation in question, I don't go in there after him. I ask him to come out. * * * And I have a boat that is three times as big as any of the boats that are in there. I have a 75 horse power rig and when I go through there at half throttle it will wiggle my boat ever which way."

It is readily apparent to us this evidence is substantial. It is convincing and persuasive.

We, therefore, conclude the regulation in question is not unreasonable or arbitrary.

We are not unmindful of the possible financial loss claimed by the appellees. This is not such a loss, as contemplated by Section 2 of the Constitution of Kentucky and the 14 cases cited and quoted from in appellees' brief. Kentucky has come to be a state of many waters, continuously increasing with flood control and power projects. Our waters are teeming with

boats, both pleasure and fishing. Last year over 40,000 boats were registered in Kentucky. Proper regulations are expedient and necessary. Public safety looms large when compared to the insignificant financial loss of a small commercial group like appellees. In fact, a kindred agency of State Government has the power to entirely prohibit fishing for any month or period fairly deemed necessary by it. Certainly the agency here involved can, in the interest of public safety, prohibit fishing as well as boating in a small 100-foot area.

The judgment appealed from is reversed with directions to dissolve the injunction.