## Hargett et al. v. Kentucky State Fair Board et al.

January 14, 1949.

Ernest Woodward, James T. Robertson, and Woodward, Hobson & Fulton for appellants.

Marshall P. Eldred, Eli H. Brown, III, Brown & Eldred, B. L. Shamburger, A. E. Funk, Attorney General, and Guy L. Dickinson, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

In this action the appellants attack the validity of a lease of a material portion of the grounds held by the State Fair Board to the appellee, J. Fred Miles. The appeal is from a judgment upholding the lease.

The appellants ask reversal of the judgment upon the following grounds:

"1. The attempted lease extends beyond the term of the Board, and is therefore void.

"2. The State Fair Grounds belong to the public

and may not be leased or sold without specific authority from the people, which has not been given by the General Assembly.

"3. The lease authorizes private persons to operate exhibitions and attractions on State Fair Grounds for private profit, and under the control of private persons, in violation of the Statute directing 'exclusive control of such activities by the State Fair Board.'

"4. The attempted lease and option is really intended to facilitate race track gambling on the State Fair Grounds, and is contrary to the express public policy of this Commonwealth." The State Fair Board and J. Fred Miles contend vigorously that the lease is valid.

Copies of the minutes of the meetings of the Fair Board held prior to the execution of the lease and a copy of the lease were filed with the petition attacking the contract. After describing the property specifically covered by the lease, the lease recites that it is to cover a four year period at a stated annual rental, with an option giving the lessee the right to renew the lease for an additional 11 year period at a stated rental per year.

The purpose of the lease is set forth in the second paragraph thereof which follows:

"(2) That the lessee will use and occupy said premises for the conduct of horse racing and related general purposes but for no other use or purpose, and that the lessee will, at his own expense, keep said demised premises in good repair and a tenable condition during said term." The third paragraph provides that the lessee shall keep the leased property in good condition and it gives him the right to make certain improvements at his expense, subject to the approval of the Fair Board. The fourth paragraph provides in connection with the "business of racing" that "all concessions for the sale of food, drink or other articles usually sold in connection with the racing business, will be conducted on the highest possible level and that the lessee will exert due diligence to see that no objectionable concessions of any kind are allowed or permitted within the leased area." The fifth paragraph provides that during

the racing period the lessee shall have the right without additional charge to use other barns and stables on the unleased property in sufficient number "to operate a successful racing meeting." The fifth paragraph follows:

"It is further understood and agreed between the parties, that in addition to the barns and stables on the leased area, during the racing period the lessee shall have the right without additional charge to use such other additional barns and stables, in the discretion of lessor, outside the leased area, but on the grounds within the jurisdiction of the lessor in sufficient number to operate a successful racing meeting." The sixth paragraph provides that, within the discretion of the Fair Board, any barns and stables outside the leased area may be used during a racing period without additional charge, but that other than during a racing period the Board shall be entitled to collect rent for the use of all barns on and off the leased premises. The lease contains no paragraph bearing the number seven. The eighth paragraph provides that no racing will be conducted on the leased premises which will interfere with "the usual and orderly conduct of the State Fair." This paragraph follows:

"(8) It is contemplated and understood between the parties, that the lessor conducts, on and adjacent to the leased premises, the Kentucky State Fair and it is agreed that no racing will be conducted on the leased premises which will interfere with the usual and orderly conduct of the said State Fair. It is further understood and agreed between the parties that when the dates are decided for the holding of the said Kentucky State Fair, the lessor shall notify the lessee of said dates as soon as possible." The ninth paragraph relates to the duty of the lessee to protect the unleased portion of the State Fair Grounds during a racing meeting. The tenth paragraph relates to the lessor's indemnity from damage resulting from any negligent act occurring only on the leased premises, and provides that the lessee shall carry public liability insurance. The eleventh and twelfth paragraphs relate to the carrying of insurance by the lessee on the leased property and the restoration of and rental on the property in case of fire. The thirteenth paragraph provides that, in the event of the removal of the State Fair Grounds to another site in Jefferson

County, the Fair Board "shall within their discretion at said new location, provide facilities equal to or exceeding the present facilities leased to the lessee." This paragraph contains the further provision:

"It is further understood and agreed that until the new facilities and location are ready for removal to same by the lessee, that the lessee will continue to use the premises covered by this lease." The fourteenth paragraph contains an option provision in favor of the lessee and a cancellation provision in favor of the lessor. This paragraph follows:

"(14) It is further understood and agreed that in the event the Commonwealth of Kentucky or the Kentucky State Fair Board or any successor corporation set up by the Commonwealth of Kentucky, determines to sell the property on which it is presently located the Kentucky State Fair, that the lessee shall have the option of purchasing the same at the fair and reasonable market valuation set by the lessor and that in the event the lessee refuses and declines within thirty (30) days to exercise said option on all of the premises upon which is presently located the Kentucky State Fair, then the lessor, upon twelve months written notice can cancel and terminate this lease." The option to buy covers the whole of the State Fair site and not only the leased premises. The fifteenth paragraph provides that the Fair Board shall have the right of ingress and egress to its unleased premises through the premises under lease. The paragraph also provides:

"* * * that the lessee, his assignees, agents, employees or invitees, shall at all times during the racing period have access to the premises leased herein through the premises belonging to the lessor and not covered specifically by this lease. * * *" There is the further provision that the right of ingress and egress granted to the lessee shall not be used while the State Fair is being held except with the explicit permission of the Fair Board. The sixteenth paragraph relates to the conducting of "racing and related general purposes on the highest possible plane." The seventeenth, eighteenth and nineteenth paragraphs relate to the time of giving notice in the event the lessee desires to exercise his renewal option; to the cumulative rights of each party;

and to a performance bond in favor of the Fair Board in the case of new construction. The twentieth paragraph provides that the lessee will not conduct more than 60 days of horse racing any year, and in addition thereto not more than 12 days of horse racing for charitable purposes. The twenty-first paragraph relates principally to utility services. The twenty-second paragraph deals with trotting horse racing. This paragraph follows:

"(22) It is further understood and agreed that in the event the lessee conducts trotting horse races on the leased premises, there shall not be deducted from the pari-mutual take a percentage greater than sixteen and one-half (16½%) per cent." The twenty-third and last paragraph provides that the provisions of the lease shall be binding on or inure to the benefit of each party or their successors.

It is quite apparent from an examination of the minutes of the State Fair Board that some if not all of its members contemplated that trotting races were to be authorized by the contract and that they were actuated by commendable motives in attempting to make the Fair Grounds produce revenue for the State when they were not being used for Fair purposes. The contract, however, gives the lessee, his heirs or assigns the right to conduct "horse racing and related general purposes." Certainly no one would contend seriously that "related general purposes" would not include betting on horse races, as authorized by the statutes. As a matter of fact, the only reference made to trotting races in the lease restricts the pari-mutuel take on such races to 16½ per cent.

It strikes us that grave question could be raised relative to the validity of the lease because of its uncertainty, since it authorized horse racing and "related general purposes." No effort was made by the contracting parties to define or restrict "related general purposes," and we find no such definition in the statutes. We shall not attempt a discussion of this question, however, since we feel that the lease must fall for reasons hereinafter stated. For the same reason we deem it unnecessary to discuss the question as to whether the lessee should have acquired a license from the State

Racing Commission under KRS 230.040 before the lease was entered into. The lease contains no reference to a performance bond and the Fair Board was given no assurance that the lessee or his assignees would be able to conduct horse racing during the life of the lease.

Provision for holding an annual State Fair was made by the Legislature with the view of promoting the general agricultural and mechanical development of the State. While the Fair Board is required to hold an "annual Fair," the Legislature wisely left to the Board the time of holding and the duration of the Fair. Much has been said in behalf of a continuous program for the promotion of general agricultural and industrial development of the State through its Fair Board, but we are not now directly concerned with that question. We note in passing that in 1948 the Legislature created the Agricultural and Industrial Development Board of Kentucky. The purpose of the Board is to carry on a program of research and to encourage development in those fields.

We do not believe that the lease involved herein meets the test which must be applied to a contract authorizing the conducting of "horse racing and related general purposes" on a part of the State Fair Grounds. All running horse racing in Kentucky is denounced by law, except that authorized under KRS 230.040. This section vests in the State Racing Commission the power to regulate and license running horse racing. The Act creating the State Racing Commission was upheld in the case of State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S. W. 681, 25 L. R. A., N. S., 905. The opinion in that case furnishes an interesting history of horse racing and the evils attendant thereto. Under the statutes in force prior to 1893 it was held by this Court that a pari-mutuel machine used in betting on horse races was a contrivance which came within the anti-gambling statutes and that those operating them were subject to indictment. Commonwealth v. Simonds, 79 Ky. 618, 3 Ky. Law Rep. 380. It was expressly provided, however, in Chapter 177, Acts of 1893, that the prohibition against gambling should not apply to persons who sold combination or French pools on any race track during the regular races thereon. That exception was upheld in Grinstead v. Kirby, 110 S. W. 247, 33 Ky. Law Rep. 287. In 1908 the Legislature

enacted what is commonly known as the "Pool Room" Act, Chapter 46, Acts 1908. This Act was directed against gambling of various sorts, including gambling on horse races within or without the State. It contained the following section:

"The provisions of the act shall not apply to enclosures during regular race meetings or such enclosures wherein horse racing is being conducted under license from the State Racing Commission, and it shall not apply to enclosures during regular race meetings wherein trotting and pacing races are being conducted by regularly organized associations organized for that purpose." Section 6. Since 1893, the statutes directed against gambling in general, as well as those directed against betting on horse races, have included exceptions which authorize certain types of betting on regular race tracks during race meetings.

KRS 436.230 is directed against the operation of a gambling machine, game or contrivance, but pools at race tracks are exempt therefrom. The exemption in subsection (4) of that statute follows:

"Subsection (1) of this section shall not apply to persons who sell combination or French pools on any regular race track during the races on that track." KRS 436.480 provides that:

"KRS 436.440 to 436.470 shall not apply to enclosures during regular race meetings or enclosures in which horse racing is being conducted under license from the State Racing Commission, or to enclosures during regular race meetings in which trotting and pacing races are being conducted by associations regularly organized for that purpose." Gambling in any form has long been declared as being against the public policy of this State. Furthermore, all horse racing is prohibited by law except when authorized by the State through its Racing Commission.

Careful scrutiny is always given to an exception to a general statute, and especially is this true when there is an exception permitting the carrying on of an activity generally declared to be against public policy. In the case at bar there is directly involved a contract under which an agency of the State has attempted to lease a part of its property, held for a public purpose, to one for

the purpose of carrying on horse racing and related general purposes. The question is, does the lease meet the specific requirements of the restrictive exceptions surrounding betting on horse races at regular race tracks during racing meetings.

In commenting upon the general statutes relating to horse racing and betting thereon this Court said in the case of Erlanger Kennel Club v. Daugherty, 213 Ky. 648, 281 S. W. 826, 829:

"That act (C. 177, Acts of 1893) was aimed at forbidding betting, made, done, and engaged in through the operation of any sort of contrivance including racing, except where the race was run on a regularly organized and inclosed track provided exclusively for the purpose, but only the operation of French pools on such a track was exempt from (the exemption in) the exemption in the statute." The foregoing quotation from the Daugherty opinion clearly expresses the intent of the Legislature in enacting the statutes exempting from the general statutes prohibiting gambling in any form the betting on horse races during racing meetings by means of certain devices. We think the Legislature by the use of the terms "any regular race track" and "enclosures in which horse racing is being conducted under license from the State Racing Commission" meant that no activity other than horse racing is to be permitted in an enclosure or area where horse racing has been authorized and when a racing meeting is in progress.

No provision is made in the lease under consideration for a defined enclosure wherein horse racing would be conducted. It is true that a specific acreage is covered by the lease, but the lessee is given the right to use barns and stables other than those on the leased area which may be deemed necessary for the operation of a successful racing meeting. However, the lessee, his agents and invitees are given the right of ingress and egress to the leased property through the unleased property during racing meetings. We have noted also that the lease makes no absolute prohibition against horse racing when the State Fair is in progress, the only restriction being that "no racing will be conducted on leased premises which will interfere with the usual and orderly conduct of the State Fair."

Under KRS 247.140 the Fair Board is given the custody and control of the State Fair Grounds, and KRS 247.160 provides that the Fair Board shall have exclusive control of all concessions, exhibits, shows, entertainments and attractions at any place on the State Fair Grounds. It may be that the last section of the statutes just mentioned applies only when the State Fair is in progress, since the title to the Act of which that section is a part reads: "An Act relating to the operation of games of chance and gambling devices at the State Fair." Acts 1944, c. 118. However, since the lease seems to authorize horse races when the State Fair is in progress, it would authorize an interference with the Board's custody and control of concessions and the like while the State Fair is in progress. The point might well be made also that horse racing might be looked upon as "an entertainment or an attraction." It is a matter of common knowledge also that for a number of years the Fair Board has leased part of its property to a circus for its winter quarters; that one of its largest buildings has been leased to a motor company; that the United States Government has a fish hatchery on the property; and that a large hospital for the treatment of venereal diseases is operated on the State Fair Grounds by the United States Government. It is our view that the lease does not meet the specific requirements of the restrictive exceptions of the statutes surrounding horse races and betting thereon.

As a general proposition, in the absence of specific authority, a board of public officers in the exercise of its governmental powers may not make a contract extending beyond its term of office. But such a board, in the exercise of its business or proprietary powers, may contract as does a private corporation or as do individuals unless it is otherwise restrained by law. 43 Am. Jur., Public Officers, section 292; 37 Am. Jur., Municipal Corporations, section 66; McQuillin on Municipal Corporations, sections 1355 to 1356.

Question is raised as to the right of the Fair Board to authorize the use of its property for other than State Fair purposes. Certainly no one would contend that, even though the Board is vested with the power to sell any or all of the State Fair property, it could authorize a use of all or any part of it which would interfere with

the proper operation of the State Fair. It has long been the policy of the Fair Board to permit the use of some of its property for private purposes in a manner which would not interfere with the proper operation of the State Fair. We find no fault with this policy, nor do we believe that leasing of a part of the property for a period extending beyond the term of the Board members which would not interfere with the proper operation of the State Fair would be objectionable; but always such public contracts depend upon their reasonableness and must be construed in the light of the powers vested in the public agency making them. See 43 Am. Jur., Public Officers, section 293, and Note to 149 A. L. R. 341.

The lease under consideration authorizes the lessee to have in his control the leased property and to use other necessary barns and stables on unleased property for a maximum of 72 days per year. The State Fair was created for a definite, specific and very important public purpose. A contract under which the Fair Board agrees to surrender control of a major portion of its property for approximately one-fifth of each year for the next 15 years seems to us to be an unauthorized surrender of control over its property. Especially is this true in view of the present interest in the development of a continuous program for the general development of agriculture and industry in the State. Actually, negotiations are now under way for the acquisition of a larger State Fair site, and the Fair Board has publicly announced that it plans to conduct a year round State Fair on the new site. As a matter of fact, there is nothing in the statutes to prohibit the Board from inaugurating such a program on the present site.

"We think it is significant also that the Fair Board is obligated to furnish the lessee with a place for him or his assignees to carry on "horse racing and related general purposes" for a period of 15 years either on the present Fair site or on any new one that may be acquired in Jefferson County. It is true that the lease contains an option and cancellation provision, but the meaning of this provision might well require the interpretation of a court. While the Fair Board may set a fair and reasonable market value on the entire Fair site if it decides to sell it, and the lease may be canceled within a year if the lessee does not exercise his option

to purchase the site within 30 days, the lease makes no provision for the final determination of a fair and reasonable market value of the property. Obviously, if the lessee thought that the price fixed by the Fair Board was in excess of the fair and reasonable market value of the property, he would resort to court action to have determined its fair and reasonable market value.

For the reasons given we think the lease is void. Wherefore, the judgment is reversed, with directions to set it aside and for the entry of a judgment in conformity with this opinion.