# JUNE TERM, 1955.*

## HAZEL PARK RACING ASSOCIATION, INC., v. RACING COMMISSIONER.

1. CONSTITUTIONAL LAW—LEGALIZED WAGERING.

   It is not the province of either the racing commissioner or the court to encourage or discourage legalized wagering at race tracks, such a matter being for consideration by the legislature.

2. LICENSES—RACE TRACKS—CHARITY DAYS.

   The racing commissioner may not increase the number of charity days at a privately-owned race track at the expense of the owner's season (CL 1948, § 431.9).

3. SAME—DISCRETION OF OFFICERS—RACING COMMISSIONER.

   The racing commissioner does not have arbitrary power to curtail the number of days or individual dates for races at a privately-owned race track so as to favor one track over another in the same metropolitan area merely because of some differences in the facilities available for accommodating those attending the race, especially in view of statutory provision for judicial review of his action (CL 1948, § 431.9).

4. SAME—RACING COMMISSIONER—REJECTION OF APPLICATION FOR CAUSE.

   The racing commissioner has a right to reject an application to hold a racing meet for a good and reasonable cause (CL 1948, § 431.9).

5. SAME—RACING COMMISSIONER—ABUSE OF DISCRETION.

   Defendant racing commissioner abused discretion lodged in him in not allowing plaintiff 3 days for which it had made ap-

---

* Continued from Volume 342.

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Constitutional Law § 515; 24 Am Jur, Gaming and Prize Contests §§ 8, 10; 33 Am Jur, Licenses § 18.
[7] 14 Am Jur, Costs § 37.

plication and on which dates no other racing meets had been scheduled (CL 1948, § 431.9).

6. MANDAMUS—QUESTIONS REVIEWABLE—STATUTES—CHARITY RACING MEETS.

No determination is made as to whether defendant racing commissioner had acted arbitrarily in not authorizing any charity racing meets to be held at plaintiff's race track, although allowing such meets to be held on 6 days at another race track in the same metropolitan area, where lateness of petition for mandamus precludes any action as to such dates and legislature has enacted a statute, not yet effective, prohibiting the issuance of a license where profits are distributed to charitable organizations (PA 1933, No 166, § 5a, as added by PA 1955, No 240).

7. COSTS—MANDAMUS—PUBLIC QUESTION.

No costs are allowed in mandamus proceeding to compel defendant racing commissioner to grant plaintiff 3 additional days of racing, a public question being involved (CL 1948, § 431.9).

SMITH and SHARPE, JJ., dissenting.

Mandamus by Hazel Park Racing Association, Inc., a Michigan corporation, against James H. Inglis, Racing Commissioner of Michigan, to compel revision of its licensed racing schedule. Submitted June 10, 1955. (Calendar No. 46,468.) Writ granted September 6, 1955.

*John R. Monaghan, James V. Bellanca* and *Stanley E. Beattie,* for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Lawrence A. Price* and *Wilbur DeYoung,* Assistants Attorney General, for defendant.

BUTZEL, J. Petitioner, plaintiff Hazel Park Racing Association, Inc., seeks original writ of mandamus to compel defendant James H. Inglis, Michigan racing commissioner, to grant it 3 more days of

horse racing plus 6 days for charity meets which, if granted, would give plaintiff a season equal to that which defendant granted a "competitor" track.

There are 2 major racing tracks in the Detroit area, plaintiff's and that of the Michigan Racing Association, Inc., hereinafter referred to as MRA. In 1953 the 2 tracks agreed to request an equal number of days in the racing season, one track to run its meet in the late spring and early summer and the other in the late summer and early autumn. A schedule covering a period of 10 years was drawn up. For the first 5 years it allocated a fixed number of days for the early meet to MRA and an equal number of days for the late meet to plaintiff. There is no claim that this agreement is binding upon defendant racing commissioner though he and his predecessor in office have acted substantially in accordance with its terms until the present year.

Plaintiff was duly licensed to operate a racing track in 1949 and thereafter conducted annual racing meets. In 1953 defendant objected to the character and reputation of certain of plaintiff's shareholders and refused to issue a license until they disposed of their stock. We issued mandamus ordering defendant to issue the license. *Hazel Park Racing Association, Inc.,* v. *Racing Commissioner,* 336 Mich 508. Plaintiff alleges, and it is not denied, that even after our opinion was handed down defendant required that a certified copy of the Court's mandamus be served upon him before he would issue the license. The following year, 1954, defendant again refused for similar reasons to issue plaintiff a meet license. He sought the opinion of the attorney general who advised him to issue the license, saying:

"The premises upon which the question aforesaid are based were duly considered in the preparation of the pleading and briefs by this department in your behalf in the case of *Hazel Park Racing Asso-*

*ciation, Inc.,* v. *Racing Commissioner,* 336 Mich 508, and you were then advised that such matters are extraneous to the issues involved.  *  *  *  There is no doubt in my mind that you are controlled by the opinion of the Supreme Court in the cause above cited."

The preceding facts are set forth in Hazel Park's petition to this Court in order to show the animus of defendant toward it and to support its contention of unjust discrimination against it in the instant case.

Early in 1955 the defendant proposed to allot 56 days of racing to MRA, 53 days to plaintiff, and 6 days to Michigan Racing Charities, Inc., the latter to be run at MRA. A hearing on this proposal was held before the commissioner. The matter was considered and in particular the charity racing dates were discussed, plaintiff having asked for a similar number of extra days for charity meets. The defendant, however, made final his original determination as to dates of meets and charity allocations and denied permission to plaintiff to hold charity meets. Thereupon this proceeding was brought.

Plaintiff's plant was approved by the authorities when it began racing operations in 1949 and there has been improvement in it since that time. Defendant makes no claim that petitioner's plant is unsatisfactory but cites many facts to show that the plant of MRA is superior. The track at MRA is 1 mile in length while plaintiff's is 5/8 of a mile. The net depreciated valuation of MRA's physical assets is almost twice that of plaintiff's. Defendant also emphasizes that MRA has more comfortable seats with wider aisles between them, pari-mutuel facilities which accommodate bettors more efficiently and other minor advantages. We think, however, that this is best and adequately answered by the fact that attendance at petitioner's track and the revenue

from wagering (and consequently the amount that the State derives as its share) are both larger than at MRA.   It is shown that the State of Michigan derived a revenue of $9,781,558 from the plaintiff's operations during the last 4 years and a lesser amount, $9,501,312, from MRA.   The attendance at plaintiff's track during the same period was 2,667,810 people with a lower number at MRA.

Defendant further calls attention to his "important obligation  *  *  *  to consider the views of a large segment of the public in Michigan who are strongly opposed to any horse racing which includes legalized pari-mutuel wagering."

A full answer to the latter argument is that it is not the province of the commissioner or the court to encourage or discourage legalized wagering at race tracks.   Any public sentiment against it is a matter for consideration by the legislature which has spoken in no uncertain terms.

By his decision the defendant in effect subtracted 3 days from plaintiff's former schedule and gave them to Michigan Racing Charities, Inc.   These 3 days, together with the 2 charity days run in 1954 plus an increase in the total season from 114 to 115 days, equals 6 days of charity racing scheduled for 1955.   MRA retained the same number of days it had in 1954.   We do not believe that the commissioner may increase the number of charity days at the expense of plaintiff's season.   While worthy causes no doubt receive substantial benefit from charity racing and the charity meets both advertise and add to the good will of a racing track, we must consider the investment which plaintiff has in its facilities and the expectation of gain which prompted persons to become its stockholders.   It was shown that the 3 additional days would bring in a large revenue to plaintiff and consequently to the State.   To allow

the commissioner to consider charity applications as paramount to those of racing associations organized for profit, would be to sanction a possible confiscation of property and investment. The powers of the commissioner cannot be construed to extend that far.

The statute, CL 1948, § 431.9 (Stat Ann 1953 Cum Supp § 18.949), provides:

"Any person or persons desiring to conduct a racing meet within the State of Michigan, shall apply to the commissioner for a license to do so. Such application shall be filed with the secretary of the commission at least 10 days prior to the first day of each horse-racing meeting, which such person or persons propose to hold or conduct. Such application shall specify the day or days on which such racing is desired to be conducted or held, and such application shall be in such form and supply such data and information as the commissioner shall prescribe. The commissioner shall have the power to reject any application for a racing-meet license for any cause which he may deem sufficient, which rejection may be appealed to the circuit and Supreme Court."

In *People, ex rel. Empire City Trotting Club,* v. *State Racing Commission* (1907), 190 NY 31, 34, 35 (82 NE 723), a case involving a refusal to grant a license, the court said of the New York statute:

"The object of the statute vesting authority in the commission was to insure that racing in this State was properly and honestly conducted, not to prevent competition between the several racing associations, nor to secure any special pecuniary benefit to any of them. There is no provision in the statute authorizing the commission to allot particular dates on which races on the various tracks may be run, but merely to grant or refuse a license to hold races."

While the New York statute is dissimilar to ours, we too find no provision in the Michigan statute authorizing defendant to act in the arbitrary manner here shown.

The differences in plant and facilities appear to be things on which each track must take a business chance. The public seems to favor plaintiff's track. Racing is still essentially a private enterprise and if one track is better than another the various indicia of public support would determine how long a season the track can maintain. If one track by reason of being inferior suffers in attendance, wagering revenues, willingness of owners to race, et cetera, it would, in time, seek a shorter season or improve its facilities.

Whether because of increased charity dates and/or a difference in facilities we do not think that under the facts in the instant case the length of the season or the individual dates should be subject to the arbitrary control here exerted by defendant in favor of one track over another—at least in the absence of a statute indicating otherwise. As was further said in *People, ex rel. Empire City Trotting Club,* v. *State Racing Commission, supra* (p 35):

"If the theory on which the commissioners have acted in this case were to be approved, new incumbents of the office might arbitrarily favor other race tracks and deny the associations owning the present tracks, in which large sums of money have been invested, a license to hold races. Surely, the legislature, when it authorized the incorporation of racing associations, never contemplated that the capital invested in the building of the tracks should be subject to such arbitrary destruction."

The Michigan legislature was careful to provide an appeal from the rejection of the commissioner. Though defendant has a right to reject an application for good cause, he admits, and we have said,

that the cause must be reasonable. See *Leach v. Racing Commissioner*, 340 Mich 202; *Hazel Park Racing Association, Inc., v. Racing Commissioner, supra*. Reasonable good cause was not shown in this case and it was abuse of defendant's discretion not to allow plaintiff the 3 extra days of October 6, 7 and 8, 1955, on which dates no other meets are scheduled.

The commissioner awarded 6 charity days, all to the Michigan Racing Charities, Inc., to be run at the MRA track. Plaintiff also seeks equal charity dates. Two groups, Michigan Racing Charities, Inc., and the Youth Benefit Fund, both representing a number of worthy charities, were interested in obtaining charity racing days. The commissioner's reason for refusing the latter any days was that its application came too late, arriving the day after the hearing before the commissioner on this controversy. However, a week prior to the hearing, the petitioner replied to a letter from the Youth Benefit Fund. The plaintiff stated that it would be happy to allow the fund to use the track facilities without charge for 6 days, subject to the commissioner's approval. Plaintiff further advised the fund to make formal application to the commissioner. A copy of this reply was sent to the commissioner with the words:

"We respectfully urge that if you do allocate charity racing dates in Michigan that you favorably consider the application of the Youth Benefit Fund."

While the fund did not make formal application until after the hearing, its representatives were there and the whole matter of charity racing was discussed with specific reference to the Fund's desire to have some dates.

The statute, CL 1948, § 431.9 (Stat Ann 1953 Cum Supp § 18.949), requires that meet license applications be filed with the secretary of the commission at least 10 days prior to the first day of each horse-

racing meeting which such person or persons propose to hold or conduct. The hearing was held and the application submitted in February, months before the season commenced and many more months before the particular days requested would be held. The commissioner himself stated at the hearing that "I don't always receive a formal letter requesting dates." He further said that the Michigan Racing Charities' application was verbally received over a year prior to the hearing and that he considered such to have been its formal application. Therefore, defendant's refusal because of the lack of a timely, formal, written application is not warranted by the record or his own policy in that regard. The defendant was fully apprised of all the facts prior to making his final decision. Defendant's action in regard to charity dates has been set forth, not for the purpose of ordering him to grant charity dates to plaintiff's track, but for the purpose of further substantiating our view that he acted arbitrarily in this whole matter.

The lateness of this petition plus the time necessary to reach a decision precludes any action in regard to charity racing dates. It is to be noted that P.A. 1955, No 240,* not given immediate effect, prohibits the issuance of a license to conduct a horse-racing meeting: "to any organization organized for a charitable purpose or organized for the purpose of distributing its profits or income to charitable organizations."

In view of this statute any unjust discrimination in regard to charity racing dates and consequent loss of benefits derived therefrom cannot recur.

Mandamus will issue ordering defendant to grant plaintiff the 3 additional days of racing. No costs, a public question being involved.

---

* This act adds section 5a to PA 1933, No 199 (CL 1948, § 431.5a [Stat Ann 1955 Cum Supp § 18.945(1)]).—Reporter.

CARR, C. J., and BOYLES, DETHMERS, and KELLY, JJ., concurred with BUTZEL, J.

REID, J., concurred in the result.

SMITH, J. (*dissenting*). I cannot find, on the record before us, the prejudice and bias offensive to my Brother. I find, on the contrary, only a painstaking and conscientious weighing of many considerations in order to arrive at a conclusion consistent with the paramount public interest. This conclusion, which cut down the number of days of racing to all applicants, was characterized as unlawful by applicant Hazel Park Racing Association, Inc., petitioner herein. In my opinion such characterization is groundless, and I believe, further, that this Court is without the authority to substitute its judicial discretion for the administrative discretion reposed in the racing commissioner by the legislature.

That the widest possible discretion was confided in the commissioner by the legislature admits of no doubt. The only restriction imposed upon him with regard to racing-meet licensing is that of reasonableness. *Leach* v. *Racing Commissioner,* 340 Mich 202. The reason for the legislative liberality is obvious. We are here in the field of the public morals. It is not uncommon in this country that legislation pertaining to gambling, liquor, and the like, vest in the controlling boards or officials summary and broad discretionary powers. Cooper, Administrative Agencies and the Courts, p 42 *et seq.* Theirs is a public trust peculiarly susceptible to abuse and corruption and often the target of powerful influences. The court of appeals of Kentucky, to which we might accord a shade of deference with respect to matters involving horse racing, described the problem in realistic terms in *State Racing Com-*

*mission* v. *Latonia Agricultural Association,* 136 Ky 173, 181, 184 (123 SW 681, 25 LRA NS 905):

"The races attract large numbers of people at the courses. Many indulge in bets on the results of the races. Moral laxity ensues. There is great temptation to fraud by the betters of heavy stakes, as by bribing jockeys, doctoring horses, and other pernicious practices. Scandals result. Such conditions are inimical to the public welfare."

And:

"Any amusement which calls together vast throngs of people, which excites in them passion or conduces to excesses, which is nearly always attended with gambling and attracts among its patrons common gamblers, and idle and vicious members of society, may be prohibited. Of course, then, it may be regulated."

The West Virginia court recently expressed itself in similar terms:

"Whatever may be said in favor of horse racing, and much can be said, it must be admitted that great evil attends its practice, such as calls for the intervention of the State, under its police power, to the end that such evil be minimized so far as it is possible to do so. This intervention and control is exercised under the police power of the State, and the use of that power rests with the legislature. The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, or natural right, which, in effect, is unlimited." *State, ex rel. Morris,* v. *West Virginia Racing Commission,* 133 W Va 179, 192 (55 SE2d 263).

Not surprising, then, is it that our State has regulated the field, and with a care commensurate with the dangers which it presents to our people. The legislature has created the office of racing commissioner.* It has given him "full power" (section 5,

* PA 1933, No 199, as amended (CL 1948 and CLS 1954, § 431.1 *et seq.* [Stat Ann and Stat Ann 1953 and 1955 Cum Supp § 18.941 *et seq.*]).

·CLS 1954, § 431.5 [Stat Ann 1953 Cum Supp ·§ 18.-945]) to prescribe the rules, regulations and conditions under which horse racing shall be conducted within this State. He must govern the betting on races by proper rules. He regulates the size of the "purse" offered· for the race. He has the power. (section 9, CL 1948, § 431.9 [Stat Ann 1953 Cum Supp § 18.949]) "to reject any application for a racing-meet license for any cause which he may deem sufficient" (the clause here under consideration). We will not recite his other manifold duties, powers and responsibilities. Suffice it to say that the legislature has confided to his discretion a power as broad as the necessities which brought it into being.

Not all statutory schemes follow the same pattern. In dealing with these grave problems in the field of public morals different States attempt different solutions. Thus in the State of New York, from which jurisdiction came the case of *People, ex rel. Empire City Trotting Club,* v. *State Racing Commission* (1907), 190 NY 31 (82 NE 723), cited by my Brother with notation of statutory dissimilarities, the statute permitted the commission far less discretion than our statute. As the New York opinion points out, "there is no provision in the statute authorizing the commission to allot particular dates on which races on the various tracks may be run, but merely to grant or refuse a license to hold· races," and the duration of the racing season was itself fixed by law. I thus do not disagree with the result of the New York decision in view of the New York statutes, but I cannot accept the language of the opinion as helpful on our particular problem.

What brings about the present charge of prejudice? A very simple situation. When making up his schedule of racing dates for 1955 the commissioner was faced with requests (for dates) from 3 groups, as against 2 for the previous year. He accordingly

eliminated 2 days from the application of the Michigan Racing Association, 4 days from Michigan Racing Charities, Inc., 3 days from petitioner, Hazel Park Racing Association, and 1 day from the harness-race meetings. He thus prescribed the same number of racing programs for the 1955 season as had prevailed for the past 2 years. None of the groups so curtailed has charged the commissioner with arbitrary and prejudicial action with the exception of petitioner, Hazel Park Racing Association, Inc. We will now examine such charge in some detail.

An obvious solution for the commissioner's problem, arising from an increased number of applications, was an increase in the number of racing dates. This he decided against. He stated:

"There has been general agreement in recent years among the racing commission, the racing associations, horsemen's groups and local civic and business groups that the present length of the racing season was adequate to satisfy the needs of the sport and that an expansion of the racing program would be detrimental to the Detroit area."

In addition, he considered, as he put it, "the important obligation of the racing commission to consider the views of a large segment of the public in Michigan who are strongly opposed to any horse racing which includes legalized pari-mutuel wagering."

We find nothing improper, nothing arbitrary, nothing prejudicial, in the commissioner's consideration of these factors. The legislature has left the number of racing days to his discretion. He exercised it and arrived at his decision, namely, not to enlarge the season but rather to leave it the same as the past season, and the season before that. Is this decision a wise one? That question is not for us. It is

his decision, not ours. Our only question, in view of the charges made, to put it bluntly, is whether he was acting fairly and honestly in reaching this decision. I believe he was.

I am impelled to comment further at this juncture that if the legislature had meant that the commissioner grant in full the requested dates of every applicant, without putting a ceiling on the number of racing days, it would not have clothed him with discretion. For discretion implies selection, the power to choose, to weigh, and to evaluate, yes, even the power to be wrong.

Having reached this decision, that it was not in the public interest that he enlarge the racing season, the commissioner's next problem, in his own words, was this:

"The principal problem that respondent had to face was how to fit a thoroughbred charity meeting into the schedule without increasing the total racing days. With 3 groups asking for dates, it was no longer possible to give each group the total that they were asking for."

It is contended that the commissioner's selection of the Michigan Racing Association plant for the running of nonprofit racing and the allocation of racing days made by him to all applicants, was arbitrary and prejudicial to Hazel Park. Was it?

The word "arbitrary" in the law has a definite meaning. An arbitrary decision is a decision reached without a basis which would justify reasonable and honest view in making such conclusion. It is whimsical, freakish, outlandish. We must carefully distinguish the case of poor judgment, even should it be exercised by the commissioner (which I do not imply). That is offensive to no law. It vitiates no decision. The reason is clear. The legislature, in its wisdom, has not prescribed that the commission-

er's human judgment be "correct" in order that it be valid. We are not concerned, then, either with unwisdom or downright error. We look only to see whether the commissioner exercised a judgment according to his best lights, however dim or bright they might be, or whether he gave vent only to his spleen, as Hazel Park charges.

How, then, did the commissioner reach the judgment described? The record leaves the matter in no doubt. He considered such elements as the expressed desires of horsemen, the size and character of the tracks, the merits and deficiencies of the barn areas, paddocks, and jockey quarters, the facilities provided for the comfort and convenience of the public, and the ease of access to the tracks from major population centers. He considered the relative values of the 2 plants. He noted that neither track ran in direct competition with the other, since each enjoyed a monopoly on its assigned operating dates, thus moneys spent and admission figures, he reasoned, could not "provide a true test of the public's preference." He compared the seating arrangements at the 2 plants, the situation of the selling and cashing windows, the washroom facilities. He was of the opinion that the Hazel Park jockeys' room was inadequate and thus was an obstacle to the smooth operating of the racing program at that track. He noted that the "fields at Hazel Park are limited to 10 horses," a limitation not obtaining with its competitor. He commented on the differences in the drainage of the 2 tracks. I will not continue the list of factors weighed, though it is far from complete. The conclusion he reached was that:

"It seems reasonable to allocate a larger share of the total to the association which provides the most extensive and comfortable facilities to the public and the best track and barn area facilities to the horsemen who provide the sport."

Thus his decision:

"I find that it will be in the best interests of the public and the horsemen to have a longer season at the Michigan Racing Association than at Hazel Park. Even so, the profit-making dates at the 2 plants are still fairly close, being 56 at MRA as against 53 at Hazel Park."

I find nothing arbitrary in a decision reached after a weighing of such factors. It is, in fact, the antithesis of an "arbitrary" decision. Whether the commissioner was right or whether he was wrong in many of his conclusions (*i.e.*, is a 5/8th's mile track inferior to a mile track?) I have no way of knowing upon this record. Fortunately, those questions are not before us.

But, pursues the petitioner, the commissioner is prejudiced against us, and thus his conclusions were not fairly arrived at. The charge is Hazel Park's and the burden of proof is on it. We indulge in no presumption that a public officer has not done his duty. In fact, the presumption is that he has. *Leach v. Racing Commissioner,* 340 Mich 202. What are we shown? A mass of argumentative trivia, in the main, so unsubstantial as not to merit comment. Thus:

"The commissioner says by corollary that we are out of step with nearly every other leading race track in America. He says this, though *we* are the 'leading' race track in this area."

But other specifications are of a more serious import, and I shall address myself to those cited by my distinguished Brother. The commissioner, it is said, demanded a certified copy of the order of this Court in the case of *Hazel Park Racing Association, Inc., v. Racing Commissioner,* 336 Mich 508, before he would act in accordance with its holding. To my mind this discloses no animus towards Hazel Park.

It is a commonplace for laymen, for banks, for trust companies, and others, to require certified copies of court orders before acting pursuant thereto. A layman might well be advised to insist thereon. It is said, also, as indicative of animus, that the commissioner in 1954 refused to issue plaintiff a meet license without an opinion of the attorney general. The commissioner's letter to the attorney general on this subject states that: "I am convinced that there was one important fact not brought to the Court's attention" in the above case. He therefore requested an opinion from the attorney general. In legal language he was asking whether or not the doctrine of *res judicata* applied on the facts as he understood them. I would say he was well advised to seek counsel on this question. The strength of Hazel Park's allegations of prejudice and animus may well be tested by the flimsy character of such charges.

Finally, it is charged that the commissioner's refusal to allocate equal charity racing dates to petitioner is indicative of his bias against it. It is not clear to me, on this record, that petitioner wanted any charity racing at its plant whatsoever, save on its own terms. It is noted that Dr. Harry W. Lindy, president of the Michigan Thoroughbred Owners' Association, stated at the public hearing on racing dates held on February 8, 1955, as follows:

"We wanted to discuss charities and we were met with unofficial replies that Hazel Park was not interested in this proposal. They didn't even have the decency to let us sit down and talk with them. They told us that if the plans involved were so good to take them to New York. We have naturally leaned to the racing association that has cooperated with us. We worked with the MRA and as result we found that the door at Hazel Park was closed."

Whatever may have been the final attitude of Hazel Park on this matter (and we note that it "re-

serves upon this record its right to challenge the validity of any award of racing-meet days to any eleemosynary and/or nonprofit corporation"), it is clear that the letter submitted by charitable groups, asking for charity racing dates at Hazel Park, requested dates from October 10, 1955, to October 15, 1955. These dates would have involved an extension of the racing season beyond that fixed by the commissioner. If we conclude, as I do, that the commissioner's decision not to expand the racing season past the time allotted in previous years, and to bring it to a close on October 5th, was within his reasonable discretion, it would follow that he was justified in rejecting the request submitted, not only on the ground of its tardy submission but also, as he put it, for the reason that "there are practical limits to the length of the Michigan racing season, as well as many good reasons why it would not be desirable to extend the season beyond its length in recent years." In this regard I will also note that I completely reject petitioner's argument that the allocation of any racing dates to charities is made at "the expense of plaintiff's season." There is no vested right in any traffic affecting the public morals. So far, indeed, is this principle carried that licenses in this area of the law may be revoked in many jurisdictions regardless of the presence or absence of licensee's personal fault. The cases are collected in 3 ALR2d 107. The only season petitioner has is that granted to it by the commissioner of racing after his consideration of all the pertinent facts. If it is his reasonable conclusion that the public welfare is better served by the allocation of certain dates to deserving charities than to petitioner, that is a matter within his sound discretion, at least until and unless the legislature, which reposed in him discretion limited only by rule of reason, sees fit to

restrict the scope thereof. (See PA 1955, No 240*.) A similar error is found in petitioner's assertion that a new hearing should be had "looking toward equal profit days of flat racing  *  *  *  and equal days of charity racing." The commissioner's criterion in the performance of his statutory duty is not equality to all applicants but the public welfare. Had the legislature wished equal racing days for all, it would have been easy to have so said. It did not do so. It created a commissioner and gave him a broad discretion. Nor can any past agreement between Hazel Park and the Michigan Racing Association splitting up the racing season in accordance with their wishes bind the commissioner. He is the guardian of the public welfare in this area and he may not surrender this public trust to the self-interest of private corporations.

The short of the matter is simply that the commissioner has displeased Hazel Park. He also displeased its competitor, whose spokesman expressed himself in the following terms:

"The charity dates were no secret from the beginning and it appeared to us that they would be a good thing for racing. I might say that we are not altogether satisfied with the result. In this proposed schedule we have had to trade a week of good days for a week of bad days and we are not pleased with that. However, the commissioner has a very difficult job and has put in a lot of time on it and we will cooperate."

The displeasure felt, however, by Hazel Park does not warrant the strictures visited upon the commissioner by it. Far from bias, prejudice, or arbitrariness, I find only a conscientious public official performing a difficult and complex task in a thoroughly painstaking manner. Whether he is wise or unwise,

---

* This act adds section 5a. See footnote, *ante,* 9.—Reporter.

whether he exercises good judgment or poor, are matters not our concern, and in the interests of judicial self-restraint, I am careful to express no opinion thereon. I will simply say that I am satisfied as to his integrity.

Writ should be denied. No costs, a public question.

SHARPE, J., concurred with SMITH, J.