Harold VANHOOSE and Tim Castle, Appellants,

v.

COMMONWEALTH of Kentucky, Natural Resources and Environmental Protection Cabinet, Appellee.

No. 1997–CA–002628–MR.

Court of Appeals of Kentucky.

May 28, 1999.

Christopher M. Hill, Linda J. West, Frankfort, Kentucky, for appellants.

Greg Higgins, Frankfort, Kentucky, for appellee.

Before BUCKINGHAM, JOHNSON, and KNOX, Judges.

## OPINION

KNOX, Judge.

This is an appeal from a judgment entered by the Franklin Circuit Court affirming an order of the Secretary of the Natural Resources and Environmental Protection Cabinet (Cabinet) in which appellants were assessed civil penalties for violations of surface mining laws and regulations. We affirm.

In February 1985, Harold Vanhoose received a surface mining permit for a two-acre tract of land he owned in Johnson County. Due to its size, the site fell within the provisions of KRS 350.060(12), under which sites of two (2) acres or less are exempt from certain surface mining provisions. Vanhoose entered into a subcontracting agreement with T & L Development (T & L), a company owned by Tim Castle and Lee Davis (now deceased), in which T & L agreed to remove the coal

from the site, and Vanhoose agreed to pay T & L $17.00 per ton of coal removed. At the time, T & L had a similar agreement with Cecil Eugene Cyrus to mine a small site within close proximity to Vanhoose's property. For over a year thereafter, T & L extracted coal from both the Vanhoose site and the Cyrus site pursuant to its agreements.

In March 1987, the Cabinet conducted an inspection of both the Cyrus and Vanhoose sites, and determined that the two sites, and their corresponding permits, were "related." As such, they were no longer entitled to statutory exemptions. The Cabinet issued notices of non-compliance, citing T & L and Castle as well as Cyrus and Vanhoose for mining coal without a proper permit, ordered them to cease all mining operations, and required them to obtain a comprehensive permit, absent any exemptions, to mine the sites. The Cabinet gave these parties thirty (30) days to take the necessary remedial measures.

On April 24, 1987, the Cabinet reinspected the two sites and found that no remedial action whatsoever had been taken. As a result, it issued cessation orders to Cyrus, Vanhoose, and Castle and Davis, d/b/a T & L Development. On June 16, 1987, the Cabinet issued notices of proposed assessment against Cyrus and Vanhoose, proposing that each be assessed a total of $32,500.00, and against Castle and Davis, proposing they be assessed a total of $65,-000.00. Following a preliminary hearing on October 1, 1987, the Cabinet requested a formal hearing.

On April 8, 1991, the Cabinet filed an administrative complaint against all parties. A formal hearing in the matter was held on September 25, 1991. The hearing officer concluded the Cabinet had failed to show the Cyrus and Vanhoose sites were related under 405 Ky. Admin. Regs. (KAR) 7:030E requiring the Cabinet to show the permits were contiguous or touching. In December 1992, upon exceptions filed by all parties, the Secretary remanded the matter for a second hearing, and ordered the hearing officer to apply 405 KAR 7:030 § 1(2), rather than 405 KAR 7:030E, to determine whether the sites were related. Specifically, section 1(2) identifies "related" sites by way of their proximity, the dates on which mining operations first occurred on the sites, their drainage flow, and their degree of common ownership or control.

The hearing on remand was held on October 20, 1993, at which time Cyrus and Davis, both deceased, were dismissed from the action. Based upon stipulations entered into by the parties, the criteria set out in 405 KAR 7:030 § 1(2), and the evidence before him, the hearing officer concluded the sites were, in fact, related. He recommended penalties be assessed against Vanhoose and Castle in the amounts of $32,500.00 and $65,000.00, respectively. Addressing the parties' exceptions on September 19, 1995, the Secretary upheld the hearing officer's findings and recommendations. The following month, in October 1995, Vanhoose and Castle appealed the Secretary's order to the Franklin Circuit Court. Approximately two (2) years later, on September 18, 1997, the circuit court affirmed the Secretary and dismissed appellants' complaint. This appeal ensued. We affirm the decision of the circuit court.

The circuit court's review of the Secretary's decision was limited to the evidence in the record. Further, as correctly noted in the order of September 18, 1997, the circuit court was obligated to uphold the decision if supported by the substantial evidence in the record and if correct as a matter of law.

When the findings of fact of an administrative commission are supported by substantial evidence of probative value, the findings are binding upon a reviewing court. Evidence is substantial if when taken alone or in the light of all the evidence, it has sufficient probative value to induce conviction in the minds of reasonable persons. The reviewing court must then determine whether the agency applied the correct rule of law to

its factual findings. If the court finds the correct rule of law was applied to facts supported by substantial evidence, the final order of the agency must be affirmed. The position of the circuit court in administrative matters is one of review, not of reinterpretation. The circuit court's review is limited to the record made before the Commission.

*Department of Educ. v. Kentucky Unemployment. Ins. Comm'n,* Ky.App., 798 S.W.2d 464, 467 (1990) (citations omitted). *See also* KRS 13B.150(2).

On appeal, appellants argue: (1) the trial court erred in ruling that a cause of action for the enforcement of civil penalties accrues when the liability for, and the amount of, the penalties have been finally established, rather than at the time the first violation is issued; (2) the penalties imposed were excessive and in violation of § 17 of the Kentucky Constitution; (3) 405 KAR 7:030, the regulation under which the VanHoose and Cyrus cites were found to be "related," violates the Kentucky Constitution's separation of powers provisions; and, (4) the trial court erred in ruling that the hearing officer's decision was supported by substantial evidence.

## ACCRUAL OF THE CAUSE OF ACTION FOR ENFORCEMENT OF CIVIL PENALTIES

■ The parties to this litigation agree that any enforcement action filed by the Cabinet would be subject to KRS 413.120(3), which provides that an action for a penalty must be commenced within five (5) years of the date the cause of action accrued. Appellants maintain the Cabinet's cause of action accrued on the date of the alleged violation, March 24, 1987, when the notices of non-compliance were issued. Appellants argue that because more than five (5) years have passed without the Cabinet's having filed an enforcement action, the penalties imposed upon appellants should be dismissed. The Cabinet counters that its cause of action to enforce the penalties did not accrue until appellants were actually assessed the pen-

alties, i.e. upon the Secretary's final order, September 19, 1995.

Addressing this issue, the circuit court noted the "long and arduous process" the Cabinet must take to impose penalties: (1) notices of non-compliance are issued, specifically identifying the alleged violations; (2) a period of time is granted the permittee during which he may correct the violations; (3) if the permittee takes no action, the Cabinet issues a cessation order and notice of proposed assessment; (4) additional time is provided the permittee to correct the alleged violations prior to an evidentiary hearing; and, (5) if, after the hearing, liability is found and penalties imposed, the parties may file exceptions. The court emphasized that all of these procedural steps take place prior to the Secretary's final imposition of penalties.

The circuit court found that the Cabinet's cause of action to enforce the penalties accrued on September 19, 1995, on which date the Secretary issued his final order imposing those penalties. We agree with the circuit court, believe its decision to be sound, and adopt its well-reasoned analysis:

> To argue that the statute of limitations accrues at the moment of violation would render the whole administrative process insignificant. This would mean that the Cabinet may bring an action to enforce civil penalties on the day after the violation occurs, before they have been adjudged to be the permittee's responsibility. The Petitioners in this case would surely object to such action, and would most likely prevail on the grounds of a due process violation.

We agree with the court that there has been established an extensive administrative process for the fair and just imposition of liability upon coal mining permittees. As such, to comport with due process requirements, we hold that a cause of action for the enforcement of civil penalties begins to run when the liability for, and amount of, the penalties have been conclusively and finally established, i.e. upon the

Secretary's final order imposing the penalties.

*PENALTIES IMPOSED*

Pursuant to KRS 350.990, the Secretary assessed penalties against Vanhoose in the amount of $10,000.00 for having violated the permit requirements contained in KRS 350.060, and $22,500.00 for having failed to abate the violations by April 24, 1987, for a total of $32,500.00. Likewise, the Secretary assessed identical penalties against Castle, but imposed them twice, once for each site at issue, for a total of $65,000.00. Rejecting appellants' argument that the fines assessed by the Secretary were excessive and in violation of Ky. Const. § 17, the circuit court stated:

> Civil penalties are designed to punish unlawful conduct and to deter future violations, from both the fined party as well as all others similarly situated. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 228–230, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). The $10,000 fines were imposed against Castle and Van Hoose because they were found to engage in mining coal without a proper permit. The Commonwealth has a significant interest in deterring unlawful mining, for such mining has an environmental and economic impact on the state as a whole. *See* KRS 350.020. Thus, a significant monetary penalty must be in place so that it would not be "regarded by potential violators ... as nothing more than an acceptable cost of violation, rather than as a deterrence to violation." *ITT Continental,* 420 U.S. at 231, 95 S.Ct.926.

Addressing the additional fine of $22,500.00 for failure to abate the violations, the court further opined:

> At $750 per day for each violation, this is a further incentive by the Cabinet to remedy the violations in an effort to protect the lands upon which the mining takes place. Such an amount is not unreasonable, particularly given the enormous amount of damage that improper mining and reclamation can do to the land. Further, the fine schedule in place is identical to that of the federal Surface Mining Control and Reclamation Act, which has been thoroughly examined and deemed to be a reasonable sanction for the proscribed conduct.

■ We agree with the circuit court that the primary purpose of the civil penalties imposed by KRS Chapter 350 is that of deterrence. We believe the court appropriately referenced *ITT Continental,* and correctly interpreted its holding. While Kentucky's case law does not lend a great deal of assistance in this matter, federal cases address the role of administrative agencies, and the nature of their involvement, in imposing and enforcing penalties. "The assessment of a penalty is particularly delegated to the administrative agency. Its choice of sanction is not to be overturned unless 'it is unwarranted in law' or 'without justification in fact.' The assessment is not a factual finding but the exercise of a discretionary grant of power." *Panhandle Coop. Ass'n v. Environmental Protection Agency,* 771 F.2d 1149, 1151 (8 th Cir.1985) (citations omitted).

■ Under KRS 350.990, penalties for violating the permit requirements of KRS 350.060 can range from $5,000.00 to $25,000.00. In the present case, the Cabinet, in its discretion, imposed a penalty on each appellant of $10,000.00, only 40% of the maximum penalty possible. We see no evidence in the record indicating the penalty was excessive. Appellants argue that because they only inadvertently, not willfully or negligently, violated the statute, the penalties should be lower. We disagree. While the fines imposed may be intended to punish appellants, they are also designed to deter similar conduct in the future. Thus, the question whether appellants inadvertently or willfully violated KRS 350.060 is not determinative of the amount of the penalty.

■ Under KRS 350.990, penalties for the failure to abate violations set out in a noncompliance order are mandatory and,

further, shall be assessed at "not less than seven hundred and fifty dollars ($750) for each day during which the violation continues." Appellants' noncompliance orders ran for a total of thirty (30) days each and, as such, they were assessed penalties of $750.00 per day for thirty (30) days. Thus, we find that the penalties imposed by the Cabinet were not only warranted by the statutes themselves, but were justifiable in light of the facts before the Secretary and the substantial evidence in the record.

## SEPARATION OF POWERS

■ Appellants argue that 405 KAR 7:030, the regulation under which the Vanhoose and Cyrus sites were found to be "related," violates the Kentucky Constitution's separation of powers provisions, sections 27–29. Specifically, appellants maintain the regulation effectively eliminates the two-acre exemption through its expansive definitions of ownership and control. While the regulation recognizes that mining sites containing two (2) acres or less are exempt from certain surface mining provisions, it nonetheless states that no two (2) sites which are normally exempted may be "related." The regulation then identifies, by way of definition set out in section 1(2)–(4), those sites which are, in fact, related:

(2) Except as provided in subsection (3) of this section, surface coal mining operations shall be deemed related if they occur within twelve (12) months of each other, are physically related, and are under common ownership or control.

(a) Operations shall be deemed physically related if drainage from both operations flows into the same watershed at or before a point within five (5) aerial miles of both operations.

(b) Operations shall be deemed under common ownership or control if they are owned or controlled, directly or indirectly, by or on behalf of:

1. The same person;

2. Two (2) or more persons, one (1) of whom controls, is under common control with, or is controlled by the other; or

3. Members of the same family and their relatives, unless it is established that there is no direct or indirect business relationship between or among them.

(c) For purposes of this subsection, control exists if one has ownership of fifty (50) percent or more of the voting shares of, or general partnership in, an entity; any relationship which gives one (1) person the ability in fact or in law to direct what the other does; or any relationship which gives one (1) person express or implied authority to determine the manner in which coal at different sites will be mined, handled, sold or disposed of.

(3) Notwithstanding the provisions of subsection (2) of this section, the cabinet may determine, in accordance with the procedures applicable to requests for determination of exemption pursuant to Section 3 of this administrative regulation, that two (2) or more surface coal mining operations shall not be deemed related if, considering the history and circumstances relating to the coal, its location, the operations at the sites in question, all related operations and all persons mentioned in subsection (2)(b) of this section, the cabinet concludes in writing that the operations are not of the type which [the Surface Mining Control and Reclamation Act] was intended to regulate and that there is no intention on the part of the operations or persons to evade the requirements of KRS Chapter 350 or 405 KAR Chapters 7 through 24.

(4) The exemption provided by this section applies only to operations with an affected area of less than two (2) acres where coal is being extracted for commercial purposes and to surface coal mining operations within that affected area incidental to those operations.

Addressing appellants' argument, the circuit court found that the regulation merely delineates the scope of the two-acre exemption and defines the term "re-

lated." The court noted the regulation even provides for an exception to the related sites rule, at section 1(3), i.e. the Cabinet may consider two (2) sites which are technically related to be unrelated if it determines that, based on all the circumstances, such a relationship was not intended to circumvent the permit requirements. The court concluded, "[i]n short, the regulation does nothing but define the limited sites deemed to be exempted from many of the coal mining regulations."

■ We agree with the circuit court's assessment of the regulation, and adopt its well-reasoned analysis:

It is well established that the legislature may delegate power to the executive branch via an administrative agency. *E.g., State Racing Comm'n v. Latonia Agric. Ass'n*, Ky., 136 Ky. 173, 123 S.W. 681 (1909). The agency is then given some discretion in promulgating regulations to implement the general policy set forth by the legislature. *York v. Commonwealth*, Ky. App., 815 S.W.2d 415 (1991). Based on our reading of the regulations, we cannot agree that the Cabinet "effectively eliminated" the two-acre exemption by promulgating 405 KAR 7:030; rather, it properly and reasonably defined its terms and limitations.

*SUBSTANTIAL EVIDENCE*

■ At the September 1991 hearing, appellants stipulated two of the three criteria set out in 405 KAR 7:030 § 1(2). They conceded that mining operations on the two (2) sites had occurred within twelve (12) months of each other, and that drainage from both sites flowed into the same watershed at a point within five (5) aerial miles of both sites. In light of appellants' stipulations, the Cabinet took the position that the sole issue to be determined was the third prong of section 1(2), that of common ownership and control.

Appellants, however, argued they were not subject to the criteria of section 1(2). Rather, they maintained, based upon an internal memorandum issued by a former director in the Cabinet's division of field services, the proper test was whether the two (2) sites were contiguous, or touching. While the Cabinet stipulated the sites were not contiguous, it argued that: (1) the memorandum was issued nearly five (5) months after appellants had been cited for violations, and thus had no effect on their circumstances; and, (2) regardless of the contents of the memorandum, KRS Chapter 13A specifically precludes an administrative body's internal memorandum from modifying, expanding, or otherwise interpreting in an inconsistent manner the administrative regulation promulgated by that body. *See* KRS 13A.130.

The hearing officer identified the issue as whether the test set out in 405 KAR 7:030 § 1(2) was the proper test for determining the "relatedness" of two (2) mining sites or, alternatively, whether the proper test was simply that of contiguous sites. He adopted the Cabinet's argument, ultimately determining the memorandum was ineffective under KRS Chapter 13A. Thus, the issue remaining to be decided by the hearing officer was that of common ownership or control of the sites under 405 KAR 7:030 § 1(2).

The evidence at the hearing established that at the time Gene Cyrus' surface mining permit was issued, *both* he and Harold Vanhoose owned the small tract to be mined although, upon applying for the permit, Cyrus had indicated he was the sole owner of the property. Likewise, at the time Vanhoose's surface mining permit was issued for a separate piece of property, both he and Cyrus owned the site to be mined, although he, too, had indicated he was the sole owner of that site upon applying for the permit. Thus, Cyrus and Vanhoose jointly owned both mining sites at issue. Further, the evidence established that Tim Castle was removing coal from both sites, and selling it, during the same time period: (1) he mined the Cyrus site between April and July 1985, removing over five hundred (500) tons of coal and selling it; and, (2) he mined the Vanhoose site sometime between April and Decem-

ber 1985, removing 1,781 tons of coal and selling it. Castle's agreements with Cyrus and Vanhoose to mine the coal on both sites were entered into on April 9 and April 10, 1985, respectively.

Based upon the following facts, among others, the hearing officer concluded there was both common ownership and control of the two mining sites: (1) Castle was in charge of the day-to-day operations of both permits; (2) Castle sold coal from both permits; (3) Cyrus and Vanhoose jointly owned the property where both permit sites were located; (4) both Cyrus and Vanhoose entered into subcontracting agreements with T & L for the removal of the coal underlying the permits; (5) T & L obtained mines and minerals licenses to sell coal on both permits; and, (6) Castle performed work on both permits between April and December 1985. The hearing officer concluded:

Control exists, under Section 1(2)(c) when there is "any relationship which gives one person express or implied authority to determine the manner in which coal at different sites will be mined, handled, sold or disposed of." Here, Castle, a partner in T & L Development Corporation, testified that T & L was in charge of the day-to-day operations of both permits and that T & L obtained Mines and Minerals licenses to sell the coal on both permits and in fact did so. This clearly is sufficient evidence to establish that the Cyrus and Van Hoose permits were under common control.

With regard to the issue of whether there was common ownership of these operations, Cyrus and Van Hoose testified at the formal hearing that they jointly owned the property on which these permits were situated. Although this testimony contrasted with their applications in which they stated that each was the sole owner of the surface and mineral for their respective permits, their testimony at the formal hearing would establish common ownership, in addition to common control, of these operations.

Addressing appellants' argument that under *Herald v. Office of Surface Mining Reclamation and Enforcement*, 123 IBLA 334 (July 24, 1992), the Cabinet failed to establish the element of control; the hearing officer found that case to be inapplicable, factually, to appellants' situation. Rather, he found the case of *Mayne v. Office of Surface Mining Reclamation and Enforcement*, 123 IBLA 334 (July 19, 1992), to be controlling. Distinguishing the facts in both *Herald* and *Mayne*, he determined that under *Mayne*, the Cabinet had established both common ownership and control. The hearing officer assessed the two cases as follows:

After being issued a two-acre permit, Mary Herald entered into a contract with a James Davidson by which Davidson acquired the right to mine the permitted property and pay Herald a royalty. Davidson then entered into an agreement with G & E Johnson Construction to do the actual mining. G & E in turn employed Davidson to mine the Herald site. Following a relatedness investigation by OSM, it was determined that six other operations were related to Herald's by virtue of time, distance, and common control.

The issue on appeal to the Interior Board of Land Appeals was whether Mary Herald may be held responsible for violations resulting from activities on other sites solely because she was the permit holder for one of the related sites. She argued that she had no ownership or control over G & E's other operations and that therefore she and her site fail the relatedness test. The Board stated that the key to holding the permittee of a two-acre site liable on a relatedness violation is a finding that the permittee controlled the operations on related sites. The Board held that Mary Herald lacked control over operations at the related sites and, hence, issuance of the Cessation Orders to Herald was reversed.

The undersigned finds that the instant action is distinguishable from *Mary Herald*. Here, Van Hoose and Cyrus

testified at the formal hearing that they jointly owned the property where both permit sites are located. Indeed, both were acknowledging that they had an ownership interest in the operation of the other. Moreover, it appears that the decision in *Mary Herald* may have been based on certain equitable considerations which showed that Herald was a "straw" permittee for one of G & E's many operations.

Defendants contend that a person by the name of Seacat is the culprit who established the connection between these two operations by putting T & L in contact first with Cyrus and then with Van Hoose. However, as pointed out by the Cabinet, there is no documentary evidence tying Seacat to these operations and, hence, no basis for proceeding against him.

In the *Mayne* case a Cessation Order was issued to Glenys Mayne as the permittee and to C & H Coal Company as the operator on the basis that C & H was mining other sites which were related. The Cessation Order was sustained against Glenys Mayne on the basis that both sites were under the common control of C & H.

> Both sites were under the common control of C & H Coal as has been conclusively proven by the fact that it mined both sites, directed the manner and means for removing and selling the coal, obtained the mine licenses, and used its MSHA identity number for both mines. Without questions (sic), the operations were related within the meaning of the two-acre exemption.
>
> The Administrative Law Judge concluded that even though Mayne acted in good faith in acquiring the permit for his land and in allowing C & H to mine the permit, that his intentions were irrelevant to the question of whether he violated the exemption.

The Franklin Circuit Court agreed with the hearing officer's assessment of the two cases and, further, found that "even under the theory propounded in *Herald,* the sites may still be said to be under common ownership or control." The court cited the following portion of 405 KAR 7:030 § 1(2)(c) in support of its decision: "control exists if one has ... general partnership in an entity ... or any relationship which gives one (1) person express or implied authority to determine the manner in which coal at different sites will be mined, handled, sold or disposed of." The court emphasized:

> It is undisputed from the testimony at hearing that T & L had control of the day-to-day operations of *both* sites, that Van Hoose had part-ownership in the land on which *both* permits were based, and that Van Hoose entered into an agreement with T & L to extract and sell coal *after* a similar agreement had been made with an adjacent permit site, the land which Van Hoose owned.
>
> There clearly exists a common thread of both ownership and control which was not present in the *Herald* decision. There, the individual charged merely held a permit to mine one of several physically related sites, without owning the land or controlling the extraction and sale of coal from all of them. The facts are much different in the present case. Based on the clear definitions in the regulation, there is substantial evidence to conclude that the two sites were both physically related and under common ownership or control.

On appeal, appellants argue that because *Mayne* was decided by an administrative law judge, whereas *Herald* constitutes a decision of the Interior Board of Land Appeals, *Herald* should be the controlling case. Further, appellants argue there is no evidence in the record that Vanhoose exercised any control over Cyrus' permit, or vice versa, just as there was no evidence Mary Herald controlled operations on other related sites. Finally, appellants argue that Castle's testimony established it was actually a Mr. Seacat who directed the operations on both permit sites, and that Castle was not aware of any connection between Cyrus and Vanhoose at the time he entered into agree-

ments with them and performed work on their permit sites.

We have reviewed the record, and we note this testimony elicited from Tim Castle during the September 1991 hearing:

Q: While you were on the Cyrus permit, were you in charge of the day-to-day work on that permit?

A: Yes.

Q: You determined when to work?

A: Right.

Q: How to work?

A: Yes ...

Q: Did Mr. Cyrus ever come out on the permit and tell you what to do and when to do it?

A: No.

Q: Did anyone else?

A: Mr. Seacat when we first started ... he was there two or three days a week probably.

....

Q: In the work that you did on the Vanhoose permit, were you the person who made the day-to-day determinations about how to do that work?

A: Yes.

Q: Did you make the determinations about when to work?

A: Yes.

Q: What to do?

A: Right.

In light of Castle's testimony at the hearing, we do not believe appellants' assertion that Castle did not direct the day-to-day operations on the permit sites has merit. Moreover, it is Castle's testimony alone upon which appellants rely to support their allegation that Castle was not aware of any connection between Cyrus and Vanhoose. We believe, however, that it would be reasonable to conclude otherwise, given the agreements and other formal documents signed by Castle and entered of record in this matter.

Further, regardless of proof, or lack thereof, of whether either Vanhoose or Cyrus "exercised control" over the other's permit, they clearly had the ability, as joint owners of the sites, to do so. That is

all 405 KAR 7:030 § 1(2)(c) requires, i.e. "any relationship which *gives* one (1) person express or implied authority" to direct operations at a particular site. The regulation does not define "control" as the actual exercise of control over a permit but, rather, merely the authority to exercise such control.

Finally, we agree with the hearing officer that *Mayne* is the controlling authority, due to its factual similarity to the case before us. However, we agree with the circuit court that even under *Herald,* the outcome of this litigation should be no different, given the facts in the record and the applicable law. Thus, we believe the substantial evidence in the record supports the hearing officer's determination that the Cyrus and Vanhoose sites were "related," as that term is defined in 405 KAR 7:030 § 1(2), and that the trial correctly determined as such.

For the foregoing reasons, we affirm the order of the Franklin Circuit Court.

ALL CONCUR.